# Exhibit A

STATE OF RHODE ISLAND
KENT COUNT, SC.                                    SUPERIOR COURT

MICHAEL P. TATRO
(Plaintiff)

vs.                                          CASE NO.: _____

DISCOVER FINANCIAL SERVICES, LLC, a
Delaware Limited Liabiltiy Company;
MACY'S RETAIL HOLDINGS, INC. a New York
Corporation; FDS BANK, FSB, a Federal
Savings Bank; TARGET CORPORATION, a
Minnesota         Corporation;        TARGET
ENTERPRISES,    INC.,   a       Minnesota
Corporation;  TD  BANK  USA,  N.A.,  a
National Banking Association; BARCLAYS
BANK DELAWARE, a Delaware Corporation;
APPLE, INC.; a California Corporation,
TATE  &  KIRLAN  ASSOCIATES,  INC., a
Pennsylvania Corporation; DEBTSY, INC.,
A New York Corporation.
(Defendants)

---

COMPLAINT FOR MONETARY DAMAGES,
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Respectfully Submitted:

Michael P. Tatro, Pro-Se
Reg. No.: 05951-070
Federal Correctional Institute
33 1/2 Pembroke Road
Danbury, CT 06811

- 1 -

---

# I
## INTRODUCTION

1. This is a civil action brought by Michael P. Tatro (in propria persona)("Plaintiff"), seeking, inter alia, declaratory relief under the "Uniform Declaratory Judgment Act" (R.I.G.L. § 9-30-1, et seq.); statutory and punitive damages for violations of the "Fair Debt Collection Practices Act" (FDCPA) (15 U.S.C. § 1692a, et seq.); the "Rhode Island Fair Debt Collection Practices Act (RI-FDCPA)(R.I.G.L. §§ 19-14.9-1, et seq.); and the Fair Credit Reporting Act" (15 U.S.C. §§ 1681a, et seq.); for willful violations of the Plaintiff's right to privacy (R.I.G.L. § 9-1-28.1 (a)(1)); civil liability (pursuant to R.I.G.L. § 9-1-2) for the criminal offense of unlawful transfer of the Plaintiff's name, date of birth and social security number - in violation of R.I.G.L. § 11-49.1-3(a)(7); for the willful, unlawful conversion of the Plaintiff's intangible property (identification); for willful violation of the Rhode Island Deceptive Trade Practices Act (RI-DTPA)(R.I.G.L. § 6-13.1-22); and for injunctive relief pursuant to Rule 65 of the Rhode Island Superior Court Rules of Civil Procedure.

\ * * * * * * * * * * * * * * * *  '

- 2 -

---

# II
## JURISDICTION AND VENUE

### A
#### JURISDICTION

2. This Court has subject matter jurisdiciton to grant the relief sought by the Plaintiff pursuant to, inter alia, R.I.G.L. §§ 8-2-14, 9-1-2, 9-30-1, 19-14.9-13(5), 15 U.S.C. § 1681p and/or 15 U.S.C. § 1692k(d).

### B
#### VENUE

3. Venue is proper pursuant to R.I.G.L. § 9-4-3.

* * * * * * * * * * * * * * *

- 3 -

---

# III
## THE PLAINTIFF

### A
#### IDENTIFICATION

4. The Plaintiff, MICHAEL P. TATRO, is a natural person and a consumer as those terms are defined by §§ 1681a(b) and (c) of Title 15 of the United States Code.

5. The Plaintiff is a resident of the State of Rhode Island, currently in the custody of the United States Attorney General and incarcerated in the Federal Bureau of Prisons (BOP), FCI Danbury, Connecticut.

### B
#### ORIGIN OF THE PLAINTIFF'S KNOWLEDGE

6. Unless specifically stated otherwise, the Plaintiff's knowledge of the facts and substantive allegations raised in this Complaint is derived from, and premised upon, information received from, inter alia, Experian Information Solutions, Inc. (EXPERIAN), Trans Union, LLC (TRANS UNION), Equifax Information Services, LLC (EQUIFAX); from websites operated by the defendants; public marketing and advertising campaigns, as well as from statements made to the Plaintiff by present and/or former employees and/or legal counsel of the individual defendants; from public record sources, and from information revealed to the Plaintiff during the prosecution of other law suits against original grantors and debt collectors.

* * * * * * * * * * * * * * *

- 4 -

## IV
## THE DEFENDANTS

7. DISCOVER FINANCIAL SERVICES, LLC (DISCOVER), is Delaware Limited Liability Company, with offices in Riverwoods, IL.

8. MACY'S RETAIL HOLDINGS, INC. (MACY'S) is a New York Corporation with offices in Cincinnati, Ohio, and is a wholly owned subsidiary of Macy's Inc.

9. FDS BANK, FSB (FDS), is Federal Savings Bank owned by FDS Thrift Holding Co., Inc., which in turn is wholly owned by Macy's Inc.

10. TARGET CORPORATION (TARGET CORP) is a Minnesota Corporation, with offices in Minnesota.

11. TARGET ENTERPRISES, INC. (TARGET), is a wholly owned subsidiary of Target Corporation, with offices in Minnesota.

12. TD BANK USA, N.A. (TD), a national banking association, is a wholly owned subsidiary of TD Bank US Holding Company, a Delaware Corporation, which in turn is a wholly-owned subsidiary of TD Group US Holdings LLC, a Delaware limited liability company, which in turn is a wholly-owned subsidiary of Toronto-Dominion Bank, a Canadian-charted bank.

13. BARCLAYS BANK DELAWARE (BARCLAYS) is a Delaware Corporation, with offices in Wilmington, Delaware.

14. APPLE, INC. (APPLE) is a California Corporation, with offices in Cupertino California, and retail stores located in the State of Rhode Island.

15. TATE & KIRLAN ASSOCIATES, INC. (TATE), is a Pennsylvania Corporation, with offices in Langhorne, Pennsylvania, and is registered with the Rhode Island Secretary of State as a foreign corporation authorized to transact business in Rhode Island as a debt collector.

– 5 –

16. DEBTSY, INC. (DEBTSY) is a New York Corporation with offices in New York, and is registered with the Rhode Island Secretary of State as a foreign corporation authorized to transact business in Rhode Island as a debt collector.

17. – 24. RESERVED.

••••••••••

– 6 –

## V
## PERMISSIBLE JOINDER OF DEFENDANTS

### RULE 20(a)
### RHODE ISLAND SUPERIOR COURT RULES OF CIVIL PROCEDURE

26. Pursuant to Rule 20(a) of the Superior Court Rules of Civil Procedure, joinder of the within-named defendants is proper insofar as (a) the Plaintiff has asserted against each defendant, jointly, severally or in the alternative, a right to relief under the following General Laws of Rhode Island: (a) § 9-1-2 (Civil Liability for Crimes and Offenses); (b) § 9-1-28.1-1 (Right to Privacy); (c) § 9-30-1, et seq. (Uniform Declaratory Judgment Act); (d) § 19-14.9-1, et seq. (Rhode Island Fair Debt Collection Practices Act); as well as under the following federal statutes: (e) Fair Credit Reporting Act (15 U.S.C. § 1681a, et seq.), and (f) the Fair Debt Collection Practices Act (15 U.S.C. § 1692, et seq.) in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences.

27. For example, beginning in approximately 2011 and continuing through 2014, while the Plaintiff was in the custody of the United States Attorney General and confined to the Federal Bureau of Prisons, an identity thief/imposter ("IMPOSTER") gained unlawful access to, and control over, the Plaintiff's means of identification (i.e. name, date of birth, social security number and drivers license number).

28. Thereafter, the IMPOSTER utilized the Plaintiff's means of identification to open numerous major credit card accounts, retail store credit card accounts and cellular telephone accounts (collectively referred to as the "FRAUDULENT ACCOUNTS") in the Plaintiff's name, without his knowledge or consent.

– 7 –

29. The Plaintiff was not involved in the opening and/or use of any of the FRAUDULENT ACCOUNTS and did not sign his name to any account applications, opening documents, sales receipts or invoices.

30. The IMPOSTER was able to unlawfully use the Plaintiff's means of identification to open the FRAUDULENT ACCOUNTS because the original creditors from whom the IMPOSTER sought credit in the Plaintiff's name failed and/or refused to obtain and verify valid identification from the IMPOSTER.

31. In some instances, sales representatives employed by the original credit grantors intentionally failed to obtain and verify valid identification from the IMPOSTER in order to increase their sales commissions and bonuses which they are awarded for successfully convincing a customer to apply for a store credit card, or to pay for purchases with an existing store credit card.

32. Once the FRAUDULENT ACCOUNTS were opened in the Plaintiff's name, the IMPOSTER was allowed to make purchases with those credit accounts and credit lines.

33. At times, the IMPOSTER was even allowed to request, and was actually granted increases to the credit limits on the FRAUDULENT ACCOUNTS by making a series of nominal minimum payments after utilizing part or all of the initial credit line authorized at the time a particular FRAUDULENT ACCOUNT was opened.

34. Eventually, the FRAUDULENT ACCOUNTS were charged up to, and in some cases, above their assigned limited, defaulted on, and then placed for collection or sold to debt collectors on the secondary market.

35. In addition to the FRAUDULENT ACCOUNTS being placed for collection or sold to debt collectors on the secondary market, each of the FRAUDULENT ACCOUNTS was reported and re-reported to consumer reporting agencies, such as EXPERIAN, TRANS UNION and EQUIFAX, and those accounts were incorrectly attributed to the Plaintiff and were reported in a negative and derogatory manner (i.e. late

– 8 –

payments, missed payments, charged-off, collection status, etc.) when the Plaintiff had no involvement in the opening and/or use of the FRAUDULENT ACCOUNTS.

36. When the Plaintiff became aware of the FRAUDULENT ACCOUNTS being inaccurately and negatively reported against him by the original creditors and/or third party debt collectors, the Plaintiff filed disputes of those FRAUDULENT ACCOUNTS directly with EXPERIAN, TRANS UNION and/or EQUIFAX, and informed those consumer reporting agencies that he did not open or authorize the opening or use of those FRAUDULENT ACCOUNTS and that he was a victim of identity theft while incarcerated.

37. In the case of each and every dispute the Plaintiff filed regarding the FRAUDULENT ACCOUNTS being incorrectly and negatively included within his personal credit reports, the consumer reporting agencies promptly notified the original creditor or third party debt collector furnishing the account information of the Plaintiff's dispute -- via their respective automated dispute mechanisms -- and notified the original creditors and third party debt collectors of their duty to reinvestigate the FRAUDULENT ACCOUNTS they were reporting about the Plaintiff and further informed those original creditors and third party debt collectors that the Plaintiff reported being a victim of identity theft.

38. In some cases, the FRAUDULENT ACCOUNTS were simultaneously reported to TRANS UNION, EXPERIAN and/or EQUIFAX, while those same accounts were reported by one or more third party debt collectors who either purchased the FRAUDULENT ACCOUNTS or who had received authorization to collect those accounts from the original creditor, resulting in double and sometimes triple reporting of the same exact account, a willful practice which served to compound the damage to the Plaintiff's personal credit score and reputation.

-9-

39. Although the Plaintiff filed FCRA compliant disputes directly with the consumer reporting agencies, those consumer reporting agencies forwarded those disputes to the original creditors and/or third party debt collectors made subject to this lawsuit, those debt collectors nevertheless willfully failed or refused to properly investigate those disputes, favoring instead canned reinvestigation methods which encompassed nothing more than comparing the biographical and account details contained in the consumer reporting agency's files, with their own internal records.

40. In numerous other cases, when a particular debt collector received notice of the Plaintiff's dispute directly from EXPERIAN, TRANS UNION and/or EQUIFAX, that debt collector simply closed its internal collection file on the FRAUDULENT ACCOUNT it was attempting to collect, and then either returned the collection file to the original creditor, or sold or reassigned the collection file to a different third party debt collector, depending on the nature of the authority under which they were attempting to collect the FRAUDULENT ACCOUNT form the Plaintiff (i.e. were they the current owner of the FRAUDULENT ACCOUNT via purchase or assignment, or, were they attempting to collect the debt on behalf of the original creditor for a fee?).

41. In cases where the collection file was returned to the original creditor, the original creditor simply reassigned the FRAUDULENT ACCOUNT to a new third party debt collector without ever informing them that (a) the Plaintiff disputed the FRAUDULENT ACCOUNT and (b) that the previous third party debt collector did not complete an investigation of the Plaintiff's report of identity theft.

42. The return and reassignment of the FRAUDULENT ACCOUNTS between myriad debt collectors and the original creditors resulted in the repeated reporting and re-reporting of the FRAUDULENT ACCOUNTS in a negative and inaccurate manner

-10-

against the Plaintiff, without a single adequate and FCRA compliant investigation ever being conducted into the dispute details (i.e. the theft of the Plaintiff's identity) reported to the original creditors and third party debt collectors by the consumer reporting agencies.

43. The return and reassignment of the FRAUDULENT ACCOUNTS between myriad debt collectors and the original creditors also triggered a virtually automatic (and certainly robotic) chain of credit report inquiries about the Plaintiff by each and every new third party debt collector to become involved with (via purchase or placement for collection) with the FRAUDULENT ACCOUNTS, as well as additional account review inquiries which were made into the Plaintiff's credit reports as a matter of course by the original creditors - even in cases where the original creditor no longer owned or serviced the FRAUDULENT ACCOUNTS.

44. In other cases, a third party debt collector would report and re-report one of the FRAUDULENT ACCOUNTS to a consumer reporting agency in its own corporate name, in violation of the Rhode Island Fair Debt Collection Practices Act (R.I.G.L. § 19-14.9-8(k)), even while the original creditor who no longer owned the FRAUDULENT ACCOUNT continued to report the FRAUDULENT ACCOUNT in it own name.

45. In addition to willfully conducting inadequate and robotic investigations of the disputes the Plaintiff filed directly with the consumer reporting agencies (and which those agencies transmitted to the original creditors and third party debt collectors) the third party debt collectors made party to this (and three other) lawsuits) also refused to respond to the Plaintiff's numerous written requests that (a) they identify the name of the original creditor related to their inquiry and collection efforts and (b) they validate whatever debt they purported to be collecting when they obtained the Plaintiff's credit report.

-11-

46. As a result of the conduct identified in this section, and as further expounded upon, _infra_, more than 177 separate and distinct copies of the Plaintiff's personal and confidential credit report(s) were obtained from EXPERIAN, TRANS UNION and EQUIFAX between 2011 and the present, in connection with the opening, use and collection of at least fifteen (15) credit accounts in which the Plaintiff had absolutely no involvement in the opening and/or use of.

47. In each and every case where an original creditor or third party debt collector obtained a credit report about the Plaintiff, the entity requesting that credit report did so by:

- Certifying to the consumer reporting agency that they had a permissible purpose to obtain the Plaintiff's credit report, when they never took any steps to insure that the Plaintiff was actually involved in the credit transaction at issue, and;

- By transferring to the consumer reporting agency all or part of the Plaintiff's means of identification, which the Plaintiff did not provide to those entities, or otherwise authorize those entities to use or possess.

48. Additionally, there are questions of law and/or fact common to all defendants which will arise in this action, namely:

- Are the Plaintiff's credit reports entitled to, or expected to be, private within the meaning of the Rhode Island Privacy Act (R.I.G.L. §§ 9-1-28.1-, et seq.)?

- Is the Plaintiff's "means of identification" as defined by R.I.G.L. § 11-49.1-2(3)(1) entitled to or expected to be private within the meaning of the Rhode Island Privacy Act (R.I.G.L. § 9-1-28.1, et seq.)?

- Does the language of R.I.G.L. § 19-14.9-9, or 15 U.S.C. § 1692g require a debt collector to validate a debt it is attempting to collect, upon written request of a consumer who discovers the existence of the alleged debt, not through a direct contact by the debt collector, but by discovering a credit inquiry in the name of the debt collector, and then demanding information from that debt collector about the inquiry and/or related debt?

- Should, for the purposes of R.I.G.L. § 19-14.9-9, or 15 U.S.C. § 1692g, the acquisition of a consumer's credit report be construed as an "initial communication" for the purposes of triggering the validation requirements of those statutes, when the discovery by the consumer of the acquisition of his credit report is the only manner in

-12-

B: DISS

which the consumer becomes aware of the existence of the alleged debt?

- Does a debt collector's failure (or refusal) to respond to a consumer's written request for (a) its corporate information, and (b) the nature and purpose of a credit report inquiry made by a debt collector, constitute an unfair debt collection practice under the Rhode Island Fair Debt Collection Practices Act, or its Federal counterpart, the Fair Debt Collection Practices Act?

- Does a debt collector who certifies to a consumer reporting agency that it has a permissible purpose to obtain a credit report - when no such purpose exists - and/or the debt collector did not take any steps to verify and confirm the debt or identification and alleged involvement of the consumer in the original credit transaction - beyond accepting the seller's/assignor's blanket warranty thereof - violate R.I.G.L. § 19-14.9-7(j), which prohibits the making of false representations in order to obtain information about a consumer, or its Federal counterpart, 15 U.S.C. § 1692e(10)?

- Does the transfer the Plaintiff's "means of identification" in order to obtain a credit report in connection with a credit transaction in which the Plaintiff was not "involved" violate R.I.G.L. § 11-49.1-3(a)(7), so as to permit the Plaintiff to invoke the private right of action provided by R.I.G.L. § 9-1-2?

- Is the acquisition of a consumer's credit report "a means to collect or attempt to collect" a debt, so as to subject that activity to regulation by R.I.G.L. § 19-14.9-8, of the Rhode Island Fair Debt Collection practices Act, or its Federal counterpart, the Fair Debt Collection Practices Act?

- Is the reporting of a third party debt to a consumer reporting agency, by a debt collector, "a means to collect" a debt, so as to subject the activity to regulation by R.I.G.L. §§ 19-14.9-7 and 19-14.9-8?

**********

-13-

## VI
## GENERAL STATEMENTS

### A
### CORPORATE DEFENDANTS

49.  All references to a corporate defendant shall be construed to mean that the act(s) or omission(s) alleged, are being alleged to have been carried out or committed by the particular corporate defendant's officers, directors, managers, supervisors, employees and/or agents and assigns.

### B
### DISCOVERY BY THE PLAINTIFF

50.  Unless specifically stated otherwise, the earliest point in time at which the Plaintiff became aware of the facts supporting the allegations contained in this Complaint was in June of 2015.

### C
### STATUTE OF LIMITATIONS OR TOLLING EVENTS

51.  Although the four corners of this Complaint contain statements of facts which, in some cases, may fall outside the applicable statute of limitations, those facts are provided for background and historical purposes only. ALL causes of action pled against the defendants named in this Complaint are based entirely upon conduct which occurred within the limitation period set forth in the Fair Credit Reporting Act (15 U.S.C. § 1681p), the Fair Debt Collection Practices Act (15 U.S.C. § 1692k(d)), the Rhode Island Fair Debt Collection Practices Act (R.I.G.L. § 19-14.9-13(5)), and/or Rhode Island's three year period of limitations on personal injury (R.I.G.L. § 9-1-14(b)).

**********

-14-

B: DEFIN

## VII
## DEFINITIONS

The within Complaint contains multiple allegations of misconduct against the individually-named defendants, each of whom is alleged to have, *inter alia*, (a) violated the Fair Credit Reporting Act, (b) violated the Fair Debt Collection Practices Act, (c) violated the Rhode Island Fair Debt Collection Practices Act, (d) violated the Plaintiff's rights under the Rhode Island Privacy Act and/or (e) its corporate Rhode Island Impersonation and Identity Theft Act. And, whereas, to a large extent, the allegations raised herein present questions of first impression for the Rhode Island Superior Court and the First Circuit Court of Appeals, in order to insure consistency and avoid confusion, as well as in an effort to achieve compliance with Rule 1, Rule 8 and Rule 9 of the Rhode Island Superior Court Rules of Civil Procedure, the definitions set forth in the following Glossary shall apply to each statement of fact or Cause of Action pled herein:

### GLOSSARY

### A
### STATUTORY DEFINITIONS

#### (1)
#### FAIR CREDIT REPORTING ACT
#### (15 U.S.C. §§ 1681a through 1681x)

52.  The definitions set forth in the Fair Credit Reporting Act (15 U.S.C. § 1681a (a)-(y)), are attached hereto and incorporated by reference as APPENDIX - A1, and shall apply to all like terms used throughout this Complaint.

#### (2)
#### THE FAIR DEBT COLLECTION PRACTICES ACT
#### (15 U.S.C. § 1692a through 1692p)

53.  The definitions set forth in the Fair Debt Collection Practices Act (15 U.S.C. § 1692(a) are attached hereto, and incorporated by reference as APPENDIX - A2, and shall apply to all like terms used throughout this Complaint.

#### (3)
#### RHODE ISLAND FAIR DEBT COLLECTION PRACTICES ACT
#### (R.I.G.L. § 19-14.9-1, ET SEQ.)

-15-

54.  The definitions set forth in the Rhode Island Fair Debt Collection Practices Act (R.I.G.L. § 19-14.9-3), are attached hereto as APPENDIX - A3), and shall apply to all like terms used throughout this Complaint.

#### (4)
#### RHODE ISLAND IMPERSONATION AND IDENTITY FRAUD ACT
#### (R.I.G.L. § 11-49.1, ET SEQ.)

55.  The definitions set forth in the Rhode Island Impersonation and Identity Fraud Act (R.I.G.L. § 11-49-2) are attached hereto, and incorporated by reference as APPENDIX - A4, and shall apply to all like terms used throughout this Complaint.

#### INTERPRETATION OF 15 U.S.C § 1681b(a)(3)(A)
#### (Pintos v. Pacific Creditor's Assn.)
#### (605 F.3d 665 (9th. Cir. 2010)

56.  The Fair Credit Reporting Act authorizes consumer reporting agencies to furnish credit reports only for certain statutorily enumerated purposes; such as those set forth in 15 U.S.C. § 1681b(a)(3)(A) which permits furnishing a credit report:

(3) To a person which it has reason to believe -

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer.

57.  The First Circuit Court of Appeals has not yet defined the term "involving" as it relates to its use in § 1681b(a)(3)(A).

58.  For the purposes of the averments and causes of action pled in this Complaint, the Plaintiff has relied upon the Ninth Circuit Court of Appeals decision in Pintos v. Pac. Creditor's Assn., 605 F.3d 665 (2010), which held that for a credit inquiry to be authorized by 15 U.S.C. § 1681b(a)(3)(A), there must be a transaction which must necessarily be both (1) a credit

-16-

transaction involving the consumer on whom the information is to be furnished, and (2) involve the extension of credit to, or review or collection of an account of, the consumer", and that a person is 'involved' in a credit transaction for purposes of 15 U.S.C. § 1681b(a)(3)(A), a where []he is drawn in as a participant in the transaction, but not where []he is obliged to become associated with the transaction." (See, Pintos, Id. @ HN 6 and HN 7), and all references to the terms "involve", "involved" and/or "Involving" in the context of 15 U.S.C. § 1681b(a)(3)(A), shall be interpreted consistently with the definitions given thereto by the Pintos Court.

C
NON-STATUTORY TERMS AND ACRONYMS

58.  In addition to the definitions contained in the preceding paragraphs, the following terms shall have the following meanings or explanations, unless the context of a specific averment or allegation requires otherwise, in which case such alternate meaning or explanation will be set forth with the averment or allegation as required.

   a.  "SOFT PULL" shall refer to a consumer report inquiry which provides the requestor with only certain limited information about a consumer, and which does DOES NOT impact on a consumer's credit score and is not displayed in any subsequent credit reports except for those published directly to the consumer.

   b.  "REGULAR INQUIRY" or "HARD PULL" (a) may be used interchangeably, and (b) shall refer to a consumer report inquiry which discloses to the requestor the full contents of a consumer's credit file (except for the existence of so-called "soft pulls"), and which DOES impact or otherwise effect a consumer's credit score, and is displayed (for a period of twenty-four (24) months) in any later credit reports published about that consumer.

   C.  "ORIGINAL CREDIT TRANSACTION" shall refer to the first transaction which led to the opening of one of the accounts made subject to this lawsuit (in the Plaintiff's name and without his knowledge or consent).

   d.  "APPLICATION" or "APPLIED FOR" (a) may be used interchangeably, and (b) shall refer to the act of requesting credit from a particular credit grantor in the Plaintiff's name (without his knowledge or consent).

-17-

---

   e.  "ORIGINAL CREDITOR" shall refer to any entity whom extended any credit which created any debt allegedly owed by the Plaintiff (without his knowledge and/or consent and incurred for personal, household or family purposes) and/or any delinquent account assigned to any third-party debt collector for purposes of attempting to collect that debt from the Plaintiff.

   f.  "INITIATING DOCUMENTS" shall refer to any document which was allegedly executed by the Plaintiff and upon which document(s) a debt or obligation to pay money to the original creditor was created.

   g.  "FCRA" shall refer to the Fair Credit Reporting Act.

   h.  "FDCPA" shall refer to the Fair Debt Collection Practices Act.

   i.  RI-FDCPA shall refer to the Fair Debt Collection Practices Act.

**********

-18-

---

A: CRR

VIII
CONSUMER REPORTING AGENCY RELATIONSHIPS

A
MEMBERSHIPS MAINTAINED BY DEFENDANTS

59.  At all times relevant to the instant Complaint, the defendants each maintained subscriptions and/or memberships (hereinafter referred to as ACCESS-AGREEMENTS) with one or more consumer reporting agency (CRA).

B
MEMBERSHIP APPLICATION PROCESS

60.  Upon information and belief, before becoming an approved member or subscriber to a CRA, each defendant was subjected to an application and vetting process which required that, they:

   (a)  Completely identify the person or company seeking access to the CRA databases;

   (b)  Identify the purpose or purposes for which their access to consumer reports was necessary;

   (c)  Agree to obtain and/or use consumer reports, and the information contained in them, only for the limited statutory purposes authorized by the FCRA.

61.  Upon information and belief, at the time that each defendant was approved for access to an individual CRA database (such as EXPERIAN, EQUIFAX and/or TRANS UNION), they were furnished with a notice of their responsibilities under the FCRA, as well as notice regarding their duties and obligations under their individual contracts with the respective CRAs to which they were permitted r seeking access to. .  .

62.  Upon information and belief, the notices referred to in paragraph 0, above, included subject matter which defined or otherwise set forth their egal duty to confirm the identity of any consumer about whom a credit report is btained.

-19-

---

C
INTERFACE AND ACCESS PROTOCOL
(1)
CRA-INTERFACE

63.  Upon information and belief, once the defendant(s) completed the aforementioned vetting process required by the CRAs, those CRA'S then furnished that defendant with proprietary software or some other electronic or web-based access to their respective consumer reporting databases(s) (hereinafter referred to as a CRA-INTERFACE).

64.  Upon information and belief, each defendant-subscriber was permitted to integrate the CRA-INTERFACE with their own collection, point-of-sale and/or credit application software, in order to facilitate the processing of new credit applications and/or increases and decreases to existing credit lines, through retail and/or internet-based sales platforms.

65.  By utilizing their respective CRA-INTERFACE(S), the defendants were permitted real-time access to the confidential information contained in those proprietary databases, including, but not limited to a consumer's name, date of birth, social security number, address information, payment history, and other predictors of credit worthiness.

66.  Upon information and belief, each defendant utilizes the information which they obtain from EXPERIAN, TRANS UNION and/or EQUIFAX in order to make credit granting decisions, including the decision to open a new credit account, or to increase or decrease the credit limit of an existing account.

67.  Upon information and belief, in addition to obtaining credit reports about consumers in connection with the opening of new credit accounts, each defendant was also permitted to access the proprietary databases operated by EXPERIAN, TRANS UNION and/or EQUIFAX for the purpose(s) of conducting periodic reviews of consumer's credit history to be utilized in the determination of

-20-

consumer's continued eligibility for any previously opened credit account(s).

### D
### CREDIT REPORT REQUEST AND RETRIEVAL PROCESS
### (1)
### NEW ACCOUNT APPLICATIONS

68. Upon information and belief, in order to process a new credit application, a CRA subscriber uses their CRA-INTERFACE to transfer the applicant's name, date of birth and social security number to EXPERIAN, TRANS UNION and/or EQUIFAX.

69. Pursuant to Section 11-49.1-2(3)(i) of the General Laws of Rhode Island, a person's name, social security number and date of birth each constitute a "means of identification" for the purpose of Rhode Island's Impersonation and Identity Fraud Prevention Mechanism.

### (2)
### PERIODIC ACCOUNT REVIEW INQUIRIES

70. Upon information and belief, as approved members of the CRA databases operated by EXPERIAN, TRANS UNION, and/or EQUIFAX, each defendant was/is permitted to conduct "account review inquires" about holders of their various credit accounts, collection accounts, and other retail financing products.

71. An "account review is often referred to as a "soft pull".

..........

-21-

---

### IX
### STATEMENTS AS TO WILLFULLNESS TO SUPPORT STATUTORY AND PUNITIVE DAMAGES

### A
### AS TO ORIGINAL - CREDITOR DEFENDANTS

72. The Original-Creditor defendants, knowingly, willfully and with conscious disregard for the rights of the Plaintiff, accepted the Plaintiff's means of identification from the IMPOSTER without ever taking any reasonable steps to insure that they were accepting the Plaintiff's means of identification from the Plaintiff himself, rather than the IMPOSTER.

73. The Original-Creditor defendants failed to maintain reasonable policies and procedures for the training of employees on the topic or subject of obtaining positive photo identification from customers applying for credit, so as to insure that before a person's "means of identification" was accepted, the person who presented the "means of identification" is the lawful and true owner thereof, or, in the alternative, if the Original-Creditor defendants did have such policies or procedures in place, then the Original-Creditor defendants failed to enforce those policies and/or their respective employees intentionally ignored those policies in order to meet sales quotas and/or increase corporate profits and/or personal compensation.

74. As a result of the Original-Creditor defendants' willful disregard for the security of the Plaintiff's "means of identification", the defendants each possessed and used the Plaintiff's "means of identification" without the Plaintiff's knowledge or consent, and that conduct has resulted in the Plaintiff's "means of identification" being transferred to third-party debt collectors, CRAs, finance companies and credit card issuers who each, in turn, made further unlawful use of the Plaintiff's "means of identification", and

-22-

---

unlawfully transferred that "means of identification" to other parties, all without the Plaintiff's knowledge or consent, and/or without a lawful reason for doing so.

75. Upon information and belief, the Original-Creditor defendants each maintain and enforce certain sales quotas and impose those quotas upon their employees, and, as such, their employees are incentivized by the payment of commissions or bonuses based not only upon sales made (if the Original-Creditor defendant is a retailer), but also upon the number of new credit card accounts that an employee opens on behalf of new or existing customers.

76. As a direct result of the sales quotas and compensation methods outlined above, employees of the Original-Creditor defendants ignored certain security and identification procedures implemented to prevent identity fraud, in order to meet sales quotas and increase their individual sales numbers and personal compensation.

77. As a result of the willful conduct of the Original-Creditor defendants as described herein, the Plaintiff's privacy has been unlawfully invaded, his "means of identification" has been unlawfully possessed or transferred to multiple third-parties who have no right to posses or use that "means of identification", and his credit rating and credit score have been destroyed; and, the Original-Creditor defendants' willful failure to conduct reasonable and adequate investigations of the Plaintiff's FCRA compliant disputes of fraudulent accounts (more fully described, infra) and to instruct the removal of derogatory and inaccurate information resulting from the fraudulently opened accounts from the Plaintiff's credit reports (more fully described, infra) has made it virtually impossible for the Plaintiff to begin the processing of restoring his credit rating.

78. The acts and omissions alleged in this Complaint were committed by the

-23-

---

Original-Creditor defendants through their agents, employees and/or franchisees, in wanton and malicious disregard for the rights of the Plaintiff, and each act alleged was carried out in order to increase profits and reduce the amount of overhead required in order to obtain personal and confidential information about the Plaintiff (i.e. credit reports, credit scores, address information, etc.) for the purposes of determining whether to open, or refuse to open, new credit accounts requested by the IMPOSTER, with the least expenditure of time and money possible. For example, the Original-Creditor defendants' employees, agents, franchisees and/or assigns intentionally avoided properly verifying the identity of the IMPOSTER before requesting credit reports about the Plaintiff and opening new accounts in the Plaintiff's name, and failed to properly and adequately investigate disputes forwarded to those defendants directly from consumer reporting agencies, and instead responded to those disputes in robotic fashion, essentially nullifying the investigation edict established by the FCRA.

79. The Original-Creditor defendants' reckless and wanton disregard for the Plaintiff's rights also surfaced in the form of those defendants refusal to respond to numerous notices and letters sent to those defendants by the Plaintiff requesting information regarding the more than 170 inquiries into the Plaintiff's credit reports, as well as requests for information and documentation which would have supported those defendants' continued assertion to CRAs that Plaintiff was the owner of the fraudulent credit accounts being inaccurately and negatively reported against him.

80. Furthermore, the Original-Creditor defendants made absolutely no effort to confirm or otherwise investigate the Plaintiff's incarceration status and history which, had they done so, it would have become obvious that the Plaintiff could not have physically applied for and/or used the numerous fraudulent credit accounts opened in his name (without his knowledge or consent).

-24-

81. The Original-Creditor defendants' refusal to respond to Plaintiff's requests, even when those requests were served upon a particular defendant's registered agent, or upon a corporate officer as designated in the records of the Secretary of the State of Rhode Island, or for a particular defendant's state of incorporation, smacks of willful and wanton disregard for the law and for the rights of the Plaintiff, and has left the Plaintiff with no recourse other than the filing of this and other lawsuits.

### B
### AS TO DEBT COLLECTOR DEFENDANTS

82. The acts and omissions alleged against the debt collector defendants in this Complaint were committed by those debt collectors in wanton, reckless and malicious disregard for the rights of the Plaintiff, and each act alleged was carried out by those debt collectors in order to increase profits and reduce the amount of overhead required to obtain personal and confidential information about the Plaintiff so that they could then attempt to collect third-party debts from the Plaintiff (allegedly incurred for personal, family or household purposes), the creation of which alleged debts did not involve the Plaintiff and which were wrongly attributed to the Plaintiff, with the least expenditure of time, money and resources possible, and which alleged debts the defendants intentionally avoided properly validating, and/or investigating before making the decision to act in a manner which violated the Plaintiff's rights under the FCRA, the FDCPA, the RI-FDCPA and the Rhode Island Privacy Act, by obtaining and/or using his "means of identification" and/or obtaining his personal credit report(s) in robotic fashion, without independently verifying the purposes they certified to EXPERIAN, TRANS UNION and EQUIFAX, to insure that an FCRA permissible purpose to obtain the Plaintiff's credit report(s) actually existed.

-25-

### X
### DISCOVER FINANCIAL SERVICES, LLC

### A
### FACTUAL ALLEGATIONS AS TO DISCOVER

83. Upon information and belief, in March of 2013, a person posing as the Plaintiff (the "IMPOSTER"), provided the Plaintiff's means of identification; including, but not limited to the Plaintiff's name and social security number, directly to an employee of DISCOVER or through DISCOVER's website, and applied for credit in the Plaintiff's name, without the Plaintiff's knowledge or consent.

### B
### ORIGINAL DISCOVER CREDIT TRANSACTION

84. Upon information and belief, DISCOVER accepted the Plaintiff's means of identification from the IMPOSTER and transferred that information to EXPERIAN, TRANS UNION, and/or EQUIFAX and requested a credit report and credit score about the Plaintiff, in response to which request EXPERIAN, TRANS UNION and/or EQUIFAX prepared a credit report and credit score and about the Plaintiff and published that information to DISCOVER via its CRA-INTERFACE.

85. Upon information and belief, based upon the information contained in the credit report and credit score published to DISCOVER, DISCOVER made an internal decision to open a DISCOVER credit card account ending in 8604, in the Plaintiff's name, which the IMPOSTER was then allowed to utilize to make charges and purchases in excess of $2,300.

86. The DISCOVER credit card account referred to in paragraph 85, above, shall be referred to as the DISCOVER ACCOUNT for the purposes of the within Complaint.

87. All references to the ORIGINAL DISCOVER TRANSACTION shall refer to the

-26-

transaction described in paragraphs 83 through 86, above, which resulted in the opening of the DISCOVER ACCOUNT.

### C
### THE PLAINTIFF WAS NOT INVOLVED
### IN OPENING THE DISCOVER ACCOUNT

88. At the time of the ORIGINAL DISCOVER CREDIT TRANSACTION, the Plaintiff was in the custody of the Federal Bureau of Prisons, and/or the Rhode Island Department of Corrections, and the Plaintiff did not participate in any way in the ORIGINAL DISCOVER CREDIT TRANSACTION, and DISCOVER failed to obtain positive identification from the IMPOSTER before transferring the Plaintiff's means of identification to consumer reporting agencies and requesting credit reports about the Plaintiff, and then opening the DISCOVER ACCOUNT ending in 8604

### D
### REPORTING THE DISCOVER ACCOUNT
### TO CONSUMER REPORTING AGENCIES

89. Upon information and belief, DISCOVER began reporting the DISCOVER ACCOUNT to EXPERIAN, TRANS UNION and EQUIFAX between April and December of 2013.

### E
### DISCOVERY BY THE PLAINTIFF

90. The Plaintiff became aware of the existence of the DISCOVER ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to EQUIFAX on approximately June 30, 2015.

91. The Plaintiff became aware of the existence of the DISCOVER ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to TRANS UNION on approximately July 30, 2015.

92. The Plaintiff became aware of the existence of the DISCOVER ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to EXPERIAN on approximately September 30, 2015.

-27-

### F
### FCRA COMPLIANT DISPUTES OF THE DISCOVER ACCOUNT

93. As of the filing of the instant Complaint, the Plaintiff disputed the DISCOVER ACCOUNT directly to EXPERIAN, TRANS UNION and EQUIFAX on multiple occasions, including, inter alia, between July and September of 2015, in December of 2016, between May and July of 2017, between May and June of 2018 and in August of 2019.

94. When filing the aforementioned disputes directly with EXPERIAN, TRANS UNION and EQUIFAX between July and September of 2015, in December of 2016, between May and July of 2017, between May and June of 2018 and in August of 2019, the Plaintiff included within such disputes a notice of his incarceration status and history, as well as his assertion that he was a victim of identity fraud.

95. Upon information and belief, EXPERIAN, TRANS UNION AND EQUIFAX each notified DISCOVER of the Plaintiff's dispute of the DISCOVER ACCOUNT via their respective automated dispute resolution protocols, including notice of the Plaintiff's assertion of identity fraud and incarceration.

### G
### DISCOVER CONDUCTED INADEQUATE INVESTIGATIONS

96. Upon information and belief, the investigations conducted by DISCOVER in response to the multiple disputes filed by the Plaintiff -- and electronically forwarded to DISCOVER by each consumer reporting agency -- were limited to a cursory comparison by DISCOVER of two particular data sets, i.e. the information provided to DISCOVER by the IMPOSTER, and the personal information about the Plaintiff contained in the consumer reporting agencies' internal files.

97. Upon information and belief, DISCOVER did not make any effort to investigate or otherwise confirm the Plaintiff's incarceration status or history; and also made no effort to verify the Plaintiff's claim that he was a victim of identity fraud, both of which facts were communicated to the consumer

-28-

reporting agencies by the Plaintiff, and then to DISCOVER by the consumer reporting agencies, via their automated dispute resolution protocols.

98. Each one of DISCOVER's investigations of the Plaintiff's multiple disputes were wholly inadequate and consisted of nothing more than a canned comparison of information that DISCOVER obtained from the IMPOSTER against the information about the Plaintiff contained within the actual automated disputes received from EXPERIAN, TRANS UNION and EQUIFAX, and then robotically reporting that the DISCOVER ACCOUNT was verified as belonging to the Plaintiff.

H
#### DISCOVER FAILED AND/OR REFUSED TO DELETE THE DISCOVER ACCOUNT FROM THE PLAINTIFF'S CREDIT REPORTS

99. As of the filing of this Complaint, DISCOVER continues to report the DISCOVER ACCOUNT to EXPERIAN and EQUIFAX in a negative and inaccurate fashion against the Plaintiff, even though (a) DISCOVER has received notification - directly from the consumer reporting agencies -- of the multiple disputes filed by the Plaintiff, and (b) those multiple disputes included Plaintiff's claim that he was a victim of identity fraud while incarcerated.

100. DISCOVER's refusal and/or failure to instruct EXPERIAN and EQUIFAX to cease reporting and delete the negative and inaccurate DISCOVER ACCOUNT from the Plaintiff's credit file was the direct and proximate cause of EXPERIAN and EQUIFAX publishing and re-publishing the negative, inaccurate DISCOVER ACCOUNT information in each and every credit report they published about the Plaintiff from Approximately July of 2015 to the present.

101. DISCOVER's refusal and/or failure to instruct EXPERIAN and EQUIFAX to cease reporting and delete the negative and inaccurate DISCOVER ACCOUNT from the Plaintiff's credit files is even more puzzling considering that they apparently ceased reporting the negative and inaccurate DISCOVER ACCOUNT information to TRANS UNION in or about May of 2017.

-29-

---

#### SUBSEQUENT ACQUISITION OF PLAINTIFF'S CREDIT REPORTS

102. After obtaining the first credit report(s) about the Plaintiff in connection with the ORIGINAL DISCOVER CREDIT TRANSACTION, DISCOVER then obtained approximately thirty (30) more credit reports about the Plaintiff from TRANS UNION, including on June 09, August 09 and September 09 of 2015; July 09 and November 09 of 2016; June 09, July 09, August 09, September 09, October 09, November 09 and December 09 of 2017; January 09, February 09, March 09, April 09, May 09, June 09, July 09, August 09, September 09, October 09, November 09 and December 09 of 2018; and, January 09, February 09, March 09, April 09, May 09, 2019, June 09, July 09, and August 09 of 2019, even after having received multiple notifications that the Plaintiff did not open, own, or otherwise authorize the opening of the DISCOVER ACCOUNT.

J
#### DISCOVER FAILED TO MAINTAIN AND/OR ADHERE TO POLICIES DESIGNED TO PREVENT, DETECT AND/OR MITIGATE IDENTITY THEFT

103. DISCOVER failed to maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers, or through DISCOVER's website, actually belongs to the person presenting or submitting that means of identification and/or requesting credit from DISCOVER.

104. As a direct result of DISCOVER's failure to maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers, or through DISCOVER'S website, actually belongs to the person presenting or submitting that

-30-

---

means of identification and/or requesting credit from DISCOVER, the IMPOSTER was allowed to utilize the Plaintiff's means of identification in order to open and make purchases with, and charges to, the DISCOVER ACCOUNT ending in 8604, without (a) the Plaintiff's knowledge or consent, and (b) without being detected by DISCOVER.

105. Alternatively, if DISCOVER did maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers, or through DISCOVER's website, actually belongs to the person presenting or submitting that means of identification and/or requesting credit from DISCOVER, then DISCOVER failed to (a) properly enforce those polices and/or (b) failed to properly train employees on the implementation of those polices.

106. As a direct result of DISCOVER's failure to properly train employees and/or to enforce any policies it had in existence designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers, or through DISCOVER's website, actually belongs to the person presenting or submitting that means of identification and/or requesting credit from DISCOVER, the IMPOSTER was allowed to utilize the Plaintiff's means of identification in order to open and make purchases with, and charges to, the DISCOVER ACCOUNT ending in 8604, without (a) the Plaintiff's knowledge or consent, and (b) without being detected by DISCOVER.

K
#### DISCOVER FAILED TO MAINTAIN AND/OR ADHERE TO POLICIES DESIGNED TO INSURE THE ADEQUATE INVESTIGATION OF DISPUTES RECEIVED FROM CONSUMER REPORTING AGENCIES

-31-

---

107. DISCOVER failed to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud.

108. As a direct result of DISCOVER's failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, DISCOVER failed, or otherwise refused to delete the DISCOVER ACCOUNT from the Plaintiff's TRANS UNION credit report for more than two years from the date on which DISCOVER first received notice from TRANS UNION of the Plaintiff's Dispute.

109. As a direct result of DISCOVER's failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, DISCOVER has continually failed, or otherwise refused to delete the DISCOVER ACCOUNT from the Plaintiff's EQUIFAX credit report for more than four years from the date on which DISCOVER first received notice from EQUIFAX of the Plaintiff's Dispute.

110. As a direct result of DISCOVER's failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not

-32-

limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, DISCOVER has failed, or otherwise refused to delete the DISCOVER ACCOUNT from the Plaintiff's EXPERIAN credit report for more than four years from the date on which it first received notice from EXPERIAN of the Plaintiff's Dispute.

111. As a direct result of DISCOVER's continually failing, or otherwise refusing, to delete the DISCOVER ACCOUNT from the Plaintiff's EQUIFAX and EXPERIAN credit reports for nearly four years since first receiving notification of the Plaintiff's disputes from EQUIFAX and EXPERIAN, those consumer reporting agencies have included the negative and inaccurate DISCOVER ACCOUNT information in each and every credit report they have published about the Plaintiff since approximately 2015.

### L
### FAILURE TO INCLUDE NOTICE OF DISPUTE

112. In addition to receiving notice of Plaintiff's dispute of the DISCOVER ACCOUNT directly from EXPERIAN, TRANS UNION and EQUIFAX, DISCOVER also received notice of the dispute directly from the Plaintiff, on at least three separate occasions, between June of 2016 and the present, including a Notice of Intent to Sue, a NOTICE OF LAW SUIT AND REQUEST TO WAIVE SERVICE OF THE SUMMONS AND COMPLAINT (in a separate action filed in the Southern District of California), and responses to DISCOVER's request for additional information.

113. Notwithstanding receipt of numerous notifications directly from EXPERIAN, TRANS UNION and/or EQUIFAX, together with the communications exchanged between the Plaintiff and DISCOVER's employees, DISCOVER nevertheless has continually failed to include with the information it reports or reported to EXPERIAN, TRANS UNION and EQUIFAX any notice that the Plaintiff continues to dispute the completeness or accuracy of the information being reported, as

-33-

---

required by the FCRA (15 U.S.C. § 16A1s-2(a)(3).

### M.
### DISCOVER'S CONDUCT WAS NEGLIGENT AND/WILLFUL

114. DISCOVER's failure to enact, maintain or enforce policies, and/or to properly train employees in order to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers, or through DISCOVER's website, actually belongs to the person presenting or submitting that means of identification and/or requesting credit from DISCOVER, was negligent.

115. DISCOVER's failure to enact, maintain or enforce policies, and/or to properly train employees in order to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers, or through DISCOVER's website, actually belongs to the person presenting or submitting that means of identification and/or requesting credit from DISCOVER, was willful.

116. DISCOVER'S failure and/or refusal to delete the DISCOVER ACCOUNT from the PLAINTIFF's credit reports, even after having been properly notified about the Plaintiff's disputes and his claims of identity fraud was negligent.

117. DISCOVER'S failure and/or refusal to delete the DISCOVER ACCOUNT from the PLAINTIFF's credit reports, even after having been properly notified about the Plaintiff's disputes and claims of identity fraud was willful.

118. - 124 RESERVED.

··········

-34-

---

D: MACYS

### XI
### MACY'S RETAIL HOLDINGS, INC.

### A
### BUSINESS MODEL

125. MACY'S principal or core business consists of owning and operating numerous retail stores throughout North America, including at least two locations in the State of Rhode Island, through which it markets and sells its household and consumer products and services directly to its customers.

126. At each of its retail locations, MACY'S customers are solicited to apply for consumer retail financing in the form of a MACY'S credit card account.

127. MACY'S employs retail sales associates (RSAs) at each of its retail locations and compensates those RSAs by paying them an hourly wage, and in some instances, commissions on individual sales.

128. In addition to paying RSAs an hourly wage (and sometimes commissions) those same RSAs are also compensated for each new MACY'S credit card account they open for a customer at the point of sale.

129. EACH RSA employed by MACY'S is trained, required and incentivized to persuade customers to pay for purchases by charging the purchase price to an existing MACY'S credit card account.

130. In the event that an RSA encounters a customer who does not own a MACY'S credit card account, then the RSA is trained, required and incentivized to persuade the customer to apply for a MACY'S credit card account at the point of sale, using an application process typically referred to as "instant credit".

131. Upon information and belief, at all times relevant to the instant Complaint, MACY'S credit card accounts were issued and serviced by FDS BANK, FSB, even though the actual credit card may have contained the MACY'S corporate logo,

-35-

---

name and/or trademark.

132. In order to increase traffic into its retail locations, MACY'S conducts local, regional and national advertising campaigns through television, radio and print media sources, as well as in-store displays and promotional signs which solicit, encourage and incentivize retail customers to apply for a MACY'S credit card account as a primary means of paying for purchases made at its retail locations.

133. RSAs employed at MACY'S locations are required to achieve certain sales quotas related not only to individual sales of merchandise, but also with respect to the number of new MACY'S credit card accounts they are responsible for successfully opening on behalf of a retail customer.

134. Each MACY'S retail location is supervised by a store manager, and those managers are supervised by district and/or regional managers.

135. Each of the management levels referred to in paragraph 134, above, are compensated based upon the gross (or net) sales of their respective store(s), district(s), or region(s), in addition to being compensated based upon the number of MACY'S credit card accounts opened by RSAs under their supervision.

136. Upon information and belief, and at all times relevant to the commission of the acts or omissions alleged against MACY'S in this Complaint, when a MACY'S employee was successfully able to persuade a customer to apply for a MACY'S credit card account at the point of sale, MACY'S employees were instructed to utilize the following protocol:

    (a) The RSA gathered personal and financial information from the prospective customer (e.g. name, social security number (or portions thereof), as well as income and employment information);

    (b) The RSA then entered the prospective customer's personal and financial information into a proprietary CRA-INTERFACE which integrated the process of requesting a customer's credit report with MACY'S own credit granting system;

    (c) A decision was then made, pursuant to MACY'S credit granting

-36-

criteria, whether or not to approve or deny the customer's application for a MACY'S credit card account.

(d) The credit decision referred to in subparagraph 136(c), would then be electronically relayed to the RSA at the point of sale and, if an account was approved, the transaction would be completed by allowing the customer to charge the purchase price to the newly opened MACY'S credit card account.

B
FACTUAL ALLEGATIONS AS TO MACY'S

(1)
THE ORIGINAL MACY'S CREDIT TRANSACTION

137. Upon information and belief, in February of 2013, a person posing as the Plaintiff (the "IMPOSTER"), provided the Plaintiff's means of identification; including, but not limited to the Plaintiff's name and social security number to an employee at one of MACY'S retail locations.

138. All references to the "ORIGINAL MACY'S CREDIT TRANSACTION" shall mean the transaction referred to in paragraph 137, above.

(2)
THE MACY'S ACCOUNT

139. Upon information and belief MACY'S accepted the Plaintiff's means of identification from the IMPOSTER and transferred that information to EXPERIAN, TRANS UNION and/or EQUIFAX and requested a credit report and credit score about the Plaintiff, in response to which request EXPERIAN, TRANS UNION and/or EQUIFAX prepared a credit report and a credit score about the Plaintiff, and published that information via its CRA-INTERFACE.

140. Upon information and belief, based upon the information contained in the credit report and credit score published by EXPERIAN, TRANS UNION and/or EQUIFAX, MACY'S made the decision to open a new MACY'S credit card account ending in 8900, in the Plaintiff's name, which the IMPOSTER was then allowed to utilize to make charges on purchases in excess of $1,380.

141. The MACY'S credit card account referred to in paragraph 140, above,

-37-

shall be referred to as the MACY'S ACCOUNT for the purposes of the within Complaint.

142. All references to the ORIGINAL MACY'S TRANSACTION shall refer to the transaction described in paragraphs 137 through 139, above, which resulted in the opening of the MACY'S ACCOUNT.

143. During the ORIGINAL MACY'S TRANSACTION, MACY'S failed, or otherwise refused to obtain valid photo identification from the imposter before accepting the Plaintiff's means of identification from the IMPOSTER and then transferring that means of identification to EXPERIAN, TRANS UNION and/or EQUIFAX and requesting a credit report and credit score about the Plaintiff.

C
THE PLAINTIFF WAS NOT INVOLVED
IN OPENING THE MACY'S ACCOUNT

144. At the time of the ORIGINAL MACY'S CREDIT TRANSACTION, the Plaintiff was in the custody of the Federal Bureau of Prisons, and/or the Rhode Island Department of Corrections, and the Plaintiff did not participate in any way in the ORIGINAL MACY'S CREDIT TRANSACTION, and MACY'S failed to obtain positive identification from the IMPOSTER before transferring the Plaintiff's means of identification to consumer reporting agencies and requesting credit reports about the Plaintiff, and then opening the MACY'S ACCOUNT ending in 8604.

D
REPORTING THE MACY'S ACCOUNT
TO CONSUMER REPORTING AGENCIES

145. Upon information and belief, MACY'S began reporting the MACY'S ACCOUNT to EXPERIAN, TRANS UNION and EQUIFAX between April and December of 2013.

E
DISCOVERY BY THE PLAINTIFF

146. The Plaintiff became aware of the existence of the MACY'S ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a

-38-

"charged-off account", to EQUIFAX on approximately June 30, 2015.

147. The Plaintiff became aware of the existence of the MACY'S ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to TRANS UNION on approximately July 30, 2015.

148. The Plaintiff became aware of the existence of the MACY'S ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to EXPERIAN on approximately September 30, 2015.

F
FCRA COMPLIANT DISPUTES OF THE MACY'S ACCOUNT

149. As of the filing of the instant Complaint, the Plaintiff has disputed the MACY'S ACCOUNT directly to EXPERIAN, TRANS UNION and EQUIFAX on multiple occasions, including, inter alia, between July and September of 2015, in December of 2016, between May and July of 2017, between May and June of 2018 and in August of 2019.

150. When filing the aforementioned disputes directly with EXPERIAN, TRANS UNION and EQUIFAX between July and September of 2015, in December of 2016, between May and July of 2017, between May and June of 2018 and in August of 2019, the Plaintiff included within such disputes a notice of his incarceration status and history, as well as his assertion that he was a victim of identity fraud.

151. Upon information and belief, EXPERIAN, TRANS UNION and EQUIFAX each notified MACY'S of the Plaintiff's dispute of the MACY'S ACCOUNT via their respective automated dispute resolution protocols, including notice of the Plaintiff's assertion of identity fraud and incarceration.

G
MACY'S CONDUCTED INADEQUATE INVESTIGATIONS

152. Upon information and belief, the investigations conducted by MACY'S in response to the multiple disputes filed by the Plaintif -- and electronically forwarded to MACY'S by each consumer reporting agency -- were limited to a

-39-

cursory comparison by MACY'S of two particular data sets, i.e. the information provided to MACY'S by the IMPOSTER, and the personal information about the Plaintiff contained in the consumer reporting agencies' internal files.

153. Upon information and belief, MACY'S did not make any effort to investigate or otherwise confirm the Plaintiff's incarceration status or history; and also made no effort to verify the Plaintiff's claim that he was a victim of identity fraud, both of which facts were communicated to the consumer reporting agencies by the Plaintiff, and then to MACY'S by the consumer reporting agencies, via their automated dispute resolution protocols.

154. Each one of MACY'S investigations of the Plaintiff's multiple disputes were wholly inadequate and consisted of nothing more than a canned comparison of information that MACY'S obtained from the IMPOSTER against the information about the Plaintiff contained within the actual automated disputes received from EXPERIAN, TRANS UNION and EQUIFAX, and then robtically re-reporting that the MACY'S ACCOUNT was verified as belonging to the Plaintiff.

H
MACY'S FAILED AND/OR REFUSED TO DELETE THE
MACY'S ACCOUNT FROM THE PLAINTIFF'S CREDIT REPORTS

155. As of the filing of this Complaint, MACY'S continues to report the MACY'S ACCOUNT to EXPERIAN and EQUIFAX in a negative and inaccurate fashion against the Plaintiff, even though (a) MACY'S has received notification - directly from the consumer reporting agencies -- of the multiple disputes filed by the Plaintiff, and (b) those multiple disputes included Plaintiff's claim that he was a victim of identity fraud while incarcerated.

156. MACY'S refusal and/or failure to instruct EXPERIAN and EQUIFAX to cease reporting and delete the negative and inaccurate MACY'S ACCOUNT from the Plaintiff's credit file was the direct and proximate cause of EXPERIAN and EQUIFAX publishing and re-publishing the negative, inaccurate MACY'S ACCOUNT

-40-

information in each and every credit report they published about the Plaintiff from approximately July of 2015 to the present.

157. MACY'S refusal and/or failure to instruct EXPERIAN and EQUIFAX to cease reporting and delete the negative and inaccurate MACY'S ACCOUNT from the Plaintiff's credit files is even more puzzling considering that they apparently ceased reporting the negative and inaccurate MACY'S ACCOUNT information to TRANS UNION in or about May of 2017.

### I
### SUBSEQUENT ACQUISITION OF PLAINTIFF'S CREDIT REPORTS

158. After obtaining the first credit report(s) about the Plaintiff in connection with the ORIGINAL MACY'S CREDIT TRANSACTION, MACY'S then obtained at least two (2) additional credit reports about the Plaintiff: on May 09, 2013 from EXPERIAN and again on August 28, 2015, from EQUIFAX, without a permissible purpose and after having received notice of the Plaintiff's dispute of the MACY'S ACCOUNT directly from the consumer reporting agencies.

### J
### MACY'S FAILED TO MAINTAIN AND/OR ADHERE TO POLICIES DESIGNED TO PREVENT, DETECT AND/OR MITIGATE IDENTITY THEFT

159. MACY'S failed to maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from MACY'S.

160. As a direct result of MACY'S failure to maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification

-41-

which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from MACY'S, the IMPOSTER was allowed to utilize the Plaintiff's means of identification in order to open and make purchases with, and charges to, the MACY'S ACCOUNT ending in 8604, without (a) the Plaintiff's knowledge or consent, and (b) without being detected by MACY'S.

161. Alternatively, if MACY'S did maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from MACY'S, then MACY'S (a) failed to properly enforce those policies and/or (b) failed to properly train employees on the implementation of those policies.

162. As a direct result of MACY'S failure to properly train employees and/or to enforce any policies it had in existence designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from MACY'S, the IMPOSTER was allowed to utilize the Plaintiff's means of identification in order to open and make purchases with, and charges to, the MACY'S ACCOUNT ending in 8604, without (a) the Plaintiff's knowledge or consent, and (b) without being detected by MACY'S.

### K
### MACY'S FAILED TO MAINTAIN AND/OR ADHERE TO POLICIES DESIGNED TO INSURE THE ADEQUATE INVESTIGATION OF DISPUTES RECEIVED FROM CONSUMER REPORTING AGENCIES

-42-

163. MACY'S failed to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud.

164. As a direct result of MACY'S failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, MACY'S failed, or otherwise refused to delete the MACY'S ACCOUNT from the Plaintiff's TRANS UNION credit report for more than two years from the date on which MACY'S first received notice from TRANS UNION of the Plaintiff's Dispute.

165. As a direct result of MACY'S failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, MACY'S has continually failed, or otherwise refused to delete the MACY'S ACCOUNT from the Plaintiff's EQUIFAX credit report for more than four years from the date on which MACY'S first received notice from EQUIFAX of the Plaintiff's Dispute.

166. As a direct result of MACY'S failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to

-43-

resolve such disputes how to thoroughly investigate consumer claims of identity fraud, MACY'S has failed, or otherwise refused to delete the MACY'S ACCOUNT from the Plaintiff's EXPERIAN credit report for more than four years from the date on which it first received notice from EXPERIAN of the Plaintiff's Dispute.

167. As a direct result of MACY'S continually failing, or otherwise refusing, to delete the MACY'S ACCOUNT from the Plaintiff's EQUIFAX and EXPERIAN credit reports for nearly four years since first receiving notification of the Plaintiff's disputes from EQUIFAX and EXPERIAN, those consumer reporting agencies have included the negative and inaccurate MACY'S ACCOUNT information in each and every credit report they have published about the Plaintiff since approximately 2015.

### L
### FAILURE TO INCLUDE NOTICE OF DISPUTE

168. In addition to receiving notice of Plaintiff's dispute of the MACY'S ACCOUNT directly from EXPERIAN, TRANS UNION and EQUIFAX, MACY'S also received notice of the dispute directly from the Plaintiff, on at least three separate occasions, between July of 2016 and the present, including a NOTICE OF INTENT TO SUE, letters to MACY'S Legal Department (accompanied by detailed narratives and draft lawsuits exchanged with Ms. Julie Urzi), and the actual service of a Summons and Complaint upon MACY'S related to a separate action filed in the Southern District of California.

169. Notwithstanding receipt of numerous notifications directly from EXPERIAN, TRANS UNION and/or EQUIFAX, together with the communications exchanged between the Plaintiff and MACY'S employees, MACY'S nevertheless has continually failed to include with the information it reports or reported to EXPERIAN, TRANS UNION and EQUIFAX any notice that the Plaintiff continues to dispute the completeness or accuracy of the information being reported, as required by the FCRA (15 U.S.C. § 1681s-2(a)(3).

-44-

M
#### DOUBLE REPORTING OF MACY'S ACCOUNT

170. From at least May of 2016 until at least December of 2016, MACY'S not only refused to delete the MACY'S ACCOUNT from the Plaintiff's credit reports or include notification within its reporting tools that the Plaintiff in fact disputed the MACYS ACCOUNT, but MACYS actually reported the MACY'S ACCOUNT to TRANS UNION and EXPERIAN as two different accounts.

N.
#### MACY'S CONDUCT WAS NEGLIGENT AND WILLFUL

171. MACY'S failure to enact, maintain or enforce policies, and/or to properly train employees in order to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from MACY'S, was negligent.

172. MACY'S failure to enact, maintain or enforce policies, and/or to properly train employees in order to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from MACY'S, was willful.

173. MACY'S failure and/or refusal to delete the MACY'S ACCOUNT from the PLAINTIFF's credit reports, even after having been properly notified about the Plaintiff's disputes and his claims of identity fraud was negligent.

174. MACY'S failure and/or refusal to delete the MACY'S ACCOUNT from the PLAINTIFF's credit reports, even after having been properly notified about the

-45-

Plaintiff's disputes and claims of identity fraud was willful.

175. - 185.  RESERVED.

**********

-46-

XII
TARGET DEFENDANTS
TD BANK USA, N.A

A
#### CORPORATE STRUCTURE AND BUSINESS MODEL

186. Target Corporation is a publicly traded corporation headquartered in Minnesota.

187. Target Enterprises, Inc., is a wholly owned subsidiary of Target Corporation.

188. TD Bank USA, N.A., a national banking association, is a wholly owned subsidiary of TD Bank US Holding Company, a Delaware corporation, which in turn is a wholly-owned subsidiary of TD Group US Holdings LLC, a Delaware limited liability company, which in turn is a wholly-owned subsidiary of Toronto-Dominion Bank, a Canadian-charted bank.

189. For the purposes of this Complaint --

(a) "TD" means TD Bank USA, NA; and

(b) "TARGET" means Target Corporation's subsidiary Target Enterprises, Inc.

190. TD issues the Target-branded credit card.

191. TD has no banking branches.

191. TARGET services the Target-branded credit card that TD issues, including recordkeeping and credit-reporting services.

192. Target Corporation (TARGET CORP) owns and operates thousands of retail stores throughout North America, including several stores located in the State of Rhode Island.

194. Upon information and belief, at all times relevant to the instant Complaint, TARGET, and TD maintained a cross-marketing relationship through which customers who visit TARGET CORP'S retail stores are solicited to apply for

-47-

a Target-branded credit card issued by TD.

195. TARGET CORP employs retail sales associates (RSAs) at each of its retail locations and compensates those RSAs by paying them an hourly wage.

196. TARGET CORP employees are required to achieve certain new account application quotas, the success or failure of which requirement is an integral part of the periodic performance reviews which TARGET CORP conducts on each of its RSAs, from time-to-time.

197. The performance reviews referred to in paragraph 196, above, play a significant role in the RSA's ability to achieve pay raises and promotions within the TARGET CORP structure.

198. In some cases, in addition to receiving an hourly wage increase and other incentives attendant to the aforementioned performances reviews, RSA's are also financially compensated for successfully soliciting customers to open a new Target-branded credit card account.

199. In order to increase the number of consumer's who use Target-branded credit card accounts, each RSA employed by TARGET CORP is trained and required to solicit and persuade consumers who visit TARGET CORP's retail locations to pay for purchases using an existing Target-branded credit card account.

200. In the event that a TARGET CORP employee encounters a customer who does not own a Target-branded credit card account, then the RSA is trained, required and sometimes incentivized to solicit and persuade the customer to apply for a Target-branded credit card at the point of sale, using an application process typically referred to as "instant credit".

201. In order to increase traffic into its retail locations, TARGET CORP conducts local, regional and national advertising campaigns through television, radio and print media sources, as well as in-store displays and promotional signs which solicit, encourage and incentivize customers to apply for a

-48-

Target-branded credit card as a primary method of paying for purchases made at its retail locations.

202.  If approved for credit, customers receive a credit card bearing TARGET CORP's name and/or logo, and are then allowed to make purchases with, and charges against, that credit account at TARGET CORP's retail locations.

203.  Upon information and belief, and at all times relevant to the commission of the acts or omissions alleged against TARGET and/or TARGET CORP in this Complaint, when a TARGET or TARGET CORP employee was successfully able to persuade a customer to apply for a Target-branded credit account at the point of sale, TARGET CORP employees were instructed to utilize the following protocol:

(a) The RSA gathered personal and financial information from the prospective customer (e.g. name, social security number (or portions thereof), as well as income and employment information);

(b) The RSA then entered the prospective customer's personal and financial information into a proprietary CRA-INTERFACE which integrated the process of requesting a customer's credit report with TARGET or TARGET CORP'S own credit granting system;

(c) A decision was then made pursuant to the credit granting criteria established by TARGET, TARGET CORP, and/or TD, whether or not to approve or deny the customer's application for a Target-branded account.

(d) The credit decision referred to in subparagraph 203(c), would then be electronically relayed to the RSA at the point of sale and, if an account was approved, the transaction would be completed by allowing the customer to charge the purchase price to the newly opened Target- branded credit card account.

B
FACTUAL ALLEGATIONS AS TO TARGET,
TARGET CORP AND TD

(1)
THE ORIGINAL TARGET CREDIT TRANSACTION

204.  Upon information and belief, in March of 2013, a person posing as the Plaintiff (the "IMPOSTER"), provided the Plaintiff's means of identification; including, but not limited to the Plaintiff's name and social security number to an employee at one of TARGET CORP'S retail locations.

-49-

205.  All references to the "ORIGINAL TARGET CREDIT TRANSACTION" shall mean the transaction referred to in paragraph 204, above.

(2)
THE TARGET ACCOUNT

206.  Upon information and belief the TARGET CORP employee accepted the Plaintiff's means of identification from the IMPOSTER and transferred that information to EXPERIAN, TRANS UNION and/or EQUIFAX and requested a credit report and credit score about the Plaintiff, in response to which request EXPERIAN, TRANS UNION and/or EQUIFAX prepared a credit report and a credit score about the Plaintiff, and published that information via its CRA-INTERFACE.

207.  Upon information and belief, based upon the information contained in the credit report and credit score published by EXPERIAN, TRANS UNION and/or EQUIFAX, TARGET made the decision to open a new Target-branded credit card account in the Plaintiff's name, which the IMPOSTER was then allowed to utilize to make charges and purchases in excess of $6,131.

208.  The Target-branded credit card account referred to in paragraph 207, above, shall be referred to as the TARGET ACCOUNT for the purposes of the within Complaint.

209.  All references to the ORIGINAL TARGET CREDIT TRANSACTION shall refer to the transaction described in paragraphs 204 through 207, above, which resulted in the opening of the TARGET ACCOUNT.

210.  During the ORIGINAL TARGET CREDIT TRANSACTION, TARGET failed, or otherwise refused to obtain valid photo identification from the Imposter before accepting the Plaintiff's means of identification from the IMPOSTER and then transferring that means of identification to EXPERIAN, TRANS UNION and/or EQUIFAX and requesting a credit report and credit score about the Plaintiff.

C
THE PLAINTIFF WAS NOT INVOLVED
IN OPENING THE TARGET ACCOUNT

-50-

211.  At the time of the ORIGINAL TARGET CREDIT TRANSACTION, the Plaintiff was in the custody of the Federal Bureau of Prisons, and/or the Rhode Island Department of Corrections, and the Plaintiff did not participate in any way in the ORIGINAL TARGET CREDIT TRANSACTION, and TARGET failed to obtain positive identification from the IMPOSTER before transferring the Plaintiff's means of identification to consumer reporting agencies and requesting credit reports about the Plaintiff, and then opening the TARGET ACCOUNT in the Plaintiff's name.

D
REPORTING THE TARGET ACCOUNT
TO CONSUMER REPORTING AGENCIES

212.  Upon information and belief, TARGET began reporting the TARGET ACCOUNT to EXPERIAN, TRANS UNION and EQUIFAX in April of 2013.

E
DISCOVERY BY THE PLAINTIFF

213.  The Plaintiff became aware of the existence of the TARGET ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to EQUIFAX on approximately June 30, 2015.

214.  The Plaintiff became aware of the existence of the TARGET ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to TRANS UNION on approximately July 30, 2015.

215.  The Plaintiff became aware of the existence of the TARGET ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to EXPERIAN on approximately September 30, 2015.

F
FCRA COMPLIANT DISPUTES OF THE TARGET ACCOUNT

216.  As of the filing of the instant Complaint, the Plaintiff has disputed the TARGET ACCOUNT directly to EXPERIAN, TRANS UNION and EQUIFAX on multiple occasions, including, *inter alia*, between July and September of 2015, in

-51-

December of 2016, between May and July of 2017, between May and June of 2018 and in August of 2019.

217.  When filing the aforementioned disputes directly with EXPERIAN, TRANS UNION and EQUIFAX between July and September of 2015, in December of 2016, between May and July of 2017, between May and June of 2018 and in August of 2019, the Plaintiff included within such disputes a notice of his incarceration status and history, as well as his assertion that he was a victim of identity fraud.

218.  Upon information and belief, EXPERIAN, TRANS UNION AND EQUIFAX each notified TARGET of the Plaintiff's dispute of the TARGET ACCOUNT via their respective automated dispute resolution protocols, including notice of the Plaintiff's assertion of identity fraud and incarceration.

G
TARGET CONDUCTED INADEQUATE INVESTIGATIONS

219.  Upon information and belief, the investigations conducted by TARGET in response to the multiple disputes filed by the Plaintiff -- and electronically forwarded to TARGET by each consumer reporting agency -- were limited to a cursory comparison by TARGET of two particular data sets, i.e. the information provided to a TARGET CORP employee by the IMPOSTER, and the personal information about the Plaintiff contained in the consumer reporting agencies' internal files.

220.  Upon information and belief, TARGET did not make any effort to investigate or otherwise confirm the Plaintiff's incarceration status or history; and also made no effort to verify the Plaintiff's claim that he was a victim of identity fraud, both of which facts were communicated to the consumer reporting agencies by the Plaintiff, and then to TARGET by the consumer reporting agencies, via their automated dispute resolution protocols.

221.  Each one of TARGET's investigations of the Plaintiff's multiple

-52-

disputes were wholly inadequate and consisted of nothing more than a canned comparison of information that a TARGET CORP employee obtained from the IMPOSTER against the information about the Plaintiff contained within the actual automated disputes received from EXPERIAN, TRANS UNION and EQUIFAX, and then robtically re-reporting that the TARGET ACCOUNT was verified as belonging to the Plaintiff.

### H
### TARGET FAILED AND/OR REFUSED TO DELETE THE
### TARGET ACCOUNT FROM THE PLAINTIFF'S CREDIT REPORTS

222. As of the filing of this Complaint, TARGET continues to report the TARGET ACCOUNT to EXPERIAN and EQUIFAX in a negative and inaccurate fashion against the Plaintiff, even though (a) TARGET has received notification - directly from the consumer reporting agencies - of the multiple disputes filed by the Plaintiff, and (b) those multiple disputes included Plaintiff's claim that he was a victim of identity fraud while incarcerated.

223. TARGET's refusal and/or failure to instruct EXPERIAN and EQUIFAX to cease reporting and delete the negative and inaccurate TARGET ACCOUNT from the Plaintiff's credit file was the direct and proximate cause of EXPERIAN and EQUIFAX publishing and re-publishing the negative, inaccurate TARGET ACCOUNT information in each and every credit report they published about the Plaintiff from approximately July of 2015 to the present.

224. TARGET's refusal and/or failure to instruct EXPERIAN and EQUIFAX to cease reporting and delete the negative and inaccurate TARGET ACCOUNT from the Plaintiff's credit files is even more puzzling considering that they apparently ceased reporting the negative and inaccurate TARGET ACCOUNT information to TRANS UNION in or about May of 2017.

### I
### SUBSEQUENT ACQUISITION OF PLAINTIFF'S CREDIT REPORTS

225. After obtaining the first credit report(s) about the Plaintiff in

connection with the ORIGINAL TARGET CREDIT TRANSACTION, TARGET then obtained at least three (3) additional credit reports about the Plaintiff; between March of 2013 and June of 2016.

### J
### TARGET CORP FAILED TO MAINTAIN AND/OR ADHERE
### TO POLICIES DESIGNED TO PREVENT, DETECT AND/OR
### MITIGATE IDENTITY THEFT

226. TARGET CORP failed to maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from TARGET.

227. As a direct result of TARGET CORP'S failure to maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from TARGET, the IMPOSTER was allowed to utilize the Plaintiff's means of identification in order to open and make purchases with, and charges to, the TARGET ACCOUNT, without (a) the Plaintiff's knowledge or consent, and (b) without being detected by TARGET.

228. Alternatively, if TARGET CORP did maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting

credit from TARGET CORP, then TARGET (a) failed to properly enforce those policies and/or (b) failed to properly train employees on the implementation of those policies.

229. As a direct result of TARGET CORP'S failure to properly train employees and/or to enforce any policies it had in exsitence designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from TARGET, the IMPOSTER was allowed to utilize the Plaintiff's means of identification in order to open and make purchases with, and charges to, the TARGET ACCOUNT, without (a) the Plaintiff's knowledge or consent, and (b) without being detected by TARGET.

### K
### TARGET FAILED TO MAINTAIN AND/OR ADHERE TO
### POLICIES DESIGNED TO INSURE THE ADEQUATE
### INVESTIGATION OF DISPUTES RECEIVED FROM
### CONSUMER REPORTING AGENCIES

230. TARGET failed to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes on how to thoroughly investigate consumer claims of identity fraud.

231. As a direct result of TARGET's failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims

of identity fraud, TARGET failed, or otherwise refused to delete the TARGET ACCOUNT from the Plaintiff's TRANS UNION credit report for more than two years from the date on which TARGET first received notice from TRANS UNION of the Plaintiff's Dispute.

232. As a direct result of TARGET's failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, TARGET has continually failed, or otherwise refused to delete the TARGET ACCOUNT from the Plaintiff's EQUIFAX credit report for more than four years from the date on which TARGET first received notice from EQUIFAX of the Plaintiff's Dispute.

233. As a direct result of TARGET's failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, TARGET has failed, or otherwise refused to delete the TARGET ACCOUNT from the Plaintiff's EXPERIAN credit report for more than four years from the date on which it first received notice from EXPERIAN of the Plaintiff's Dispute.

234. As a direct result of TARGET continually failing, or otherwise refusing, to delete the TARGET ACCOUNT from the Plaintiff's EQUIFAX and EXPERIAN credit reports for nearly four years since first receiving notification of the Plaintiff's disputes from EQUIFAX and EXPERIAN, those consumer reporting agencies have included the negative and inaccurate TARGET ACCOUNT information in

each and every credit report they have published about the Plaintiff since approximately 2015.

### L
### FAILURE TO INCLUDE NOTICE OF DISPUTE

235. In addition to receiving notice of Plaintiff's dispute of the TARGET ACCOUNT directly from EXPERIAN, TRANS UNION AND EQUIFAX, TARGET also received notice of the dispute directly from the Plaintiff, on at least three separate occasions, between July of 2016 and the present, including a NOTICE OF INTENT TO SUE, letters to TARGET (accompanied by copies of draft lawsuits), and the actual service of a Summons and Complaint and Request for Waiver of Formal Service upon TARGET'S registered agent, related to a separate action filed in the Southern District of California.

236. Notwithstanding receipt of numerous notifications directly from EXPERIAN, TRANS UNION and/or EQUIFAX, together with the communications exchanged between the Plaintiff and TARGET employees, TARGET nevertheless has continually failed to include with the information it reports or reported to EXPERIAN, TRANS UNION and EQUIFAX any notice that the Plaintiff continues to dispute the completeness or accuracy of the information being reported, as required by the FCRA (15 U.S.C. § 1681s-2(a)(3).

### M
### TARGET CORP'S, TARGET'S AND TD BANK'S
### CONDUCT WAS NEGLIGENT AND WILLFULL

237. TARGET CORP's, TARGET's and TD's failure to maintain or enforce policies, and/or to properly train employees in order to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers belongs to the person presenting or submitting that means of identification and/or requesting credit from TARGET, was negligent.

-57-

238. TARGET CORP'S failure to enact, maintain or enforce policies, and/or to properly train employees in order to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from TARGET, was willful.

239. TARGET's failure and/or refusal to delete the TARGET ACCOUNT from the PLAINTIFF's credit reports, even after having been properly notified about the Plaintiff's disputes and his claims of identity fraud was negligent.

240. TARGET's failure and/or refusal to delete the TARGET ACCOUNT from the PLAINTIFF's credit reports, even after having been properly notified about the Plaintiff's disputes and claims of identity fraud was wilfull.

241. – 249. RESERVED.

**********

-58-

### XIII
### APPLE, INC.
### BARCLAYS BANK DELAWARE

### A
### FACTUAL ALLEGATIONS

250. At all times relevant to the instant Complaint, APPLE, Inc. (APPLE), owned and operated numerous retail store locations throughout North America, including locations in the State of Rhode Island, as well as a website and online store, through each of which outlet APPLE sells its products and services directly to consumers.

### B
### CROSS-MARKETING RELATIONSHIPS

251. Upon information and belief, at all times relevant to the instant Complaint, APPLE maintained a cross-marketing relationship with Barclays Bank Delaware (BARCLAYS), through which relationship APPLE was/is able to offer its customers the ability to pay for in store and online purchases by applying for credit at the point of sale, and if approved, the customer would be issued a credit card underwritten and/or serviced by BARCLAYS and that customer would be allowed to pay for purchases using that credit card account.

252. Upon information and belief, at all times relevant to the instant complaint, customers who applied for credit in person at a retail location, or through APPLES's online store, were required to provide certain personal information to APPLE and APPLE (a) stored that information in its internal files, and (b) transferred that information to BARCLAYS through a point-of-sale mechanism developed and implemented between APPLE and BARCLAYS.

### C
### ORIGINAL BARCLAYS/APPLE CREDIT TRANSACTION

253. Upon information and belief, in December of 2011, a person posing as

-59-

the Plaintiff (the IMPOSTER), provided the Plaintiff's means of identification, including but not limited to the Plaintiff's name and social security number, to an employee of APPLE or through APPLE's website, and applied for credit in the Plaintiff's name.

254. Upon information and belief, BARCLAYS/APPLE accepted the Plaintiff's means of identification from the IMPOSTER and transferred that information to EXPERIAN, TRANS UNION and/or EQUIFAX and requested a credit report and credit score about the Plaintiff, in response to which request EXPERIAN, TRANS UNION and/or EQUIFAX prepared a credit report and credit score about the Plaintiff and published that information to BARCLAYS/APPLE via a CRA-INTERFACE.

255. Upon information and belief, based upon the information contained in the credit report and credit score published to BARCLAYS/APPLE, BARCLAYS/APPLE made an internal decision to open a Barclays-branded visa account ending in 6531 in the Plaintiff's name.

256. The Barclays-branded credit card account referred to in paragraph 255, above, shall be referred to as the BARCLAYS/APPLE ACCOUNT for the purposes of this Complaint.

257. All references to the ORIGINAL BARCLAYS/APPLE CREDIT TRANSACTION shall refer to the transactions described in paragraphs 253 through 256, above.

### D
### THE PLAINTIFF WAS NOT INVOLVED
### IN OPENING THE BARCLAYS/APPLE ACCOUNT

258. At the time of the ORIGINAL BARCLAYS/APPLEE CREDIT TRANSACTION, the Plaintiff was in the custody of the Federal Bureau of Prisons, and/or the Rhode Island Department of Corrections, and the Plaintiff did not participate in any way in the ORIGINAL BARCLAYS/APPLE CREDIT TRANSACTION, and BARCLAYS/APPLE failed to obtain positive identification from the IMPOSTER before transferring the Plaintiff's means of identification to consumer reporting agencies and

-60-

requesting credit reports about the Plaintiff, and then opening the BARCLAYS/APPLE ACCOUNT ending in 6531.

### E
### REPORTING THE BARCLAYS/APPLE ACCOUNT TO CONSUMER REPORTING AGENCIES

259. Upon information and belief, BARCLAYS/APPLE began reporting the BARCLAYS/APPLE ACCOUNT to EXPERIAN, TRANS UNION and EQUIFAX in approximately April of 2013.

### F
### DISCOVERY BY THE PLAINTIFF

260. The Plaintiff became aware of the existence of the BARCLAYS/APPLE ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to EQUIFAX on approximately June 30, 2015.

261. The Plaintiff became aware of the existence of the BARCLAYS/APPLE ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to TRANS UNION on approximately July 30, 2015.

262. The Plaintiff became aware of the existence of the BARCLAYS/APPLE ACCOUNT and the fact that it was being reported negatively and inaccurately against him, as a "charged-off account", to EXPERIAN on approximately September 30, 2015.

### G
### FCRA COMPLIANT DISPUTES OF THE BARCLAYS/APPLE ACCOUNT

263. As of the filing of the instant Complaint, the Plaintiff has disputed the BARCLAYS/APPLE ACCOUNT directly to EXPERIAN, TRANS UNION and EQUIFAX on multiple occasions, including, inter alia, between July and September of 2015, in December of 2016, between May and July of 2017, between May and June of 2018 and in August of 2019.

-61-

264. When filing the aforementioned disputes directly with EXPERIAN, TRANS UNION and EQUIFAX between July and September of 2015, in December of 2016, between May and July of 2017, between May and June of 2018 and in August of 2019, the Plaintiff included within such disputes a notice of his incarceration status and history, as well as his assertion that he was a victim of identity fraud.

265. Upon information and belief, EXPERIAN, TRANS UNION AND EQUIFAX each notified BARCLAYS/APPLE of the Plaintiff's dispute of the BARCLAYS/APPLE ACCOUNT via their respective automated dispute resolution protocols, including notice of the Plaintiff's assertion of identity fraud and incarceration.

### H
### BARCLAYS/APPLE CONDUCTED INADEQUATE INVESTIGATIONS

266. Upon information and belief, the investigations conducted by BARCLAYS/APPLE in response to the multiple disputes filed by the Plaintiff -- and electronically forwarded to BARCLAYS/APPLE by each consumer reporting agency -- were limited to a cursory comparison by BARCLAYS/APPLE of two particular data sets, i.e. the information provided to BARCLAYS/APPLE by the IMPOSTER, and the personal information about the Plaintiff contained in the consumer reporting agencies' internal files.

267. Upon information and belief, BARCLAYS/APPLE did not make any effort to investigate or otherwise confirm the Plaintiff's incarceration status or history; and also made no effort to verify the Plaintiff's claim that he was a victim of identity fraud, both of which facts were communicated to the consumer reporting agencies by the Plaintiff, and then to BARCLAYS/APPLE by the consumer reporting agencies, via their automated dispute resolution protocols.

268. Each one of BARCLAYS/APPLE investigations of the Plaintiff's multiple disputes were wholly inadequate and consisted of nothing more than a canned comparison of information that BARCLAYS/APPLE obtained from the IMPOSTER against

-62-

the information about the Plaintiff contained within the actual automated disputes received from EXPERIAN, TRANS UNION and EQUIFAX, and then robotically re-reporting that the BARCLAYS/APPLE ACCOUNT was verified as belonging to the Plaintiff.

### I
### BARCLAYS/APPLE FAILED AND/OR REFUSED TO DELETE THE BARCLAYS/APPLE ACCOUNT FROM THE PLAINTIFF'S CREDIT REPORTS

269. As of the filing of this Complaint, BARCLAYS/APPLE continues to report the BARCLAYS/APPLE ACCOUNT to EXPERIAN in a negative and inaccurate fashion against the Plaintiff, even though (a) BARCLAYS/APPLE has received notification - directly from the consumer reporting agencies -- of the multiple disputes filed by the Plaintiff, and (b) those multiple disputes included Plaintiff's claim that he was a victim of identity fraud and was incarcerated.

270. BARCLAYS/APPLE's refusal and/or failure to instruct EXPERIAN and EQUIFAX to cease reporting and delete the negative and inaccurate BARCLAYS/APPLE ACCOUNT from the Plaintiff's credit file was the direct and proximate cause of EXPERIAN and EQUIFAX publishing and re-publishing the negative, inaccurate BARCLAYS/APPLE ACCOUNT information in each and every credit report they published about the Plaintiff from approximately July of 2015 to the present.

271. BARCLAYS/APPLE's refusal and/or failure to instruct EXPERIAN to cease reporting and delete the negative and inaccurate BARCLAYS/APPLE ACCOUNT from the Plaintiff's credit files is even more puzzling considering that they apparently ceased reporting the negative and inaccurate BARCLAYS/APPLE ACCOUNT information to TRANS UNION and EQUIFAX in or about May of 2017, and May of 2018, respectively.

### J
### SUBSEQUENT ACQUISITION OF THE PLAINTIFF'S CREDIT REPORTS

272. After obtaining the first credit report(s) about the Plaintiff in connection with the ORIGINAL BARCLAYS/APPLE CREDIT TRANSACTION, BARCLAYS then

-63-

obtained at least sixteen (16) additional credit reports about the Plaintiff, on 04/17/2013, 07/10/2013, 08/12/2013, 09/12/2013, 10/10/2013, 11/13/2013, 02/04/2014, and 07/15/2016 from EXPERIAN, and on 07/15/2016, 05/11/2017, 08/20/2017, 12/30/2017, 04/20/2018, 08/24/2018, 12/07/2018 and 04/12/2019 from TRANS UNION.

### K
### BARCLAYS/APPLE FAILED TO MAINTAIN AND/OR ADHERE TO POLICIES DESIGNED TO PREVENT, DETECT AND/OR MITIGATE IDENTITY THEFT

273. BARCLAYS/APPLE failed to maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from BARCLAYS/APPLE.

274. As a direct result of BARCLAYS/APPLE's failure to maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from BARCLAYS/APPLE, the IMPOSTER was allowed to utilize the Plaintiff's means of identification in order to open and make purchases with, and charges to, the BARCLAYS/APPLE ACCOUNT ending in 6531, without (a) the Plaintiff's knowledge or consent, and (b) without being detected by BARCLAYS/APPLE.

275. Alternatively, if BARCLAYS/APPLE did maintain adequate policies designed to prevent, detect and/or mitigate identity theft; including, but not

-64-

limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from BARCLAYS/APPLE, then BARCLAYS/APPLE (a) failed to properly enforce those policies and/or (b) failed to properly train employees on the implementation of those policies.

276. As a direct result of BARCLAYS/APPLE'S failure to properly train employees and/or to enforce any policies it had in existence designed to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from BARCLAYS/APPLE, the IMPOSTER was allowed to utilize the Plaintiff's means of identification in order to open and make purchases with, and charges to, the BARCLAYS/APPLE  ACCOUNT ending in 6531, without (a) the Plaintiff's knowledge or consent, and (b) without being detected by BARCLAYS/APPLE.

L.
BARCLAYS/APPLE FAILED TO MAINTAIN AND/OR ADHERE TO POLICIES DESIGNED TO INSURE THE ADEQUATE INVESTIGATION OF DISPUTES RECEIVED FROM CONSUMER REPORTING AGENCIES

277. BARCLAYS/APPLE failed to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes on how to thoroughly investigate consumer claims of identity fraud.

278. As a direct result of BARCLAYS/APPLE'S failure to establish policies

- 65 -

designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, BARCLAYS/APPLE  failed, or otherwise refused to delete the BARCLAYS/APPLE ACCOUNT from the Plaintiff's TRANS UNION credit report for more than two years from the date on which BARCLAYS/APPLE first received notice from TRANS UNION of the Plaintiff's Dispute.

279. As a direct result of BARCLAYS/APPLE'S failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, BARCLAYS/APPLE has continually failed, or otherwise refused to delete the BARCLAYS/APPLE ACCOUNT from the Plaintiff's EQUIFAX credit report for more than four years from the date on which BARCLAYS/APPLE first received notice from EQUIFAX of the Plaintiff's Dispute.

280. As a direct result of BARCLAYS/APPLE's failure to establish policies designed to insure the timely and adequate processing of FCRA compliant disputes it receives directly from consumer reporting agencies, including, but not limited to the promulgation of policies which inform and instruct employees who are assigned to resolve such disputes how to thoroughly investigate consumer claims of identity fraud, BARCLAYS/APPLE has failed, or otherwise refused to delete the BARCLAYS/APPLE EXPERIAN credit report for more than four years from the date on which it first received notice from EXPERIAN of the Plaintiff's Dispute.

281. As a direct result of BARCLAYS/APPLE continually failing, or otherwise

- 66 -

refusing, to delete the BARCLAYS/APPLE ACCOUNT from the Plaintiff's EQUIFAX and EXPERIAN credit reports for nearly four years since first receiving notification of the Plaintiff's disputes from EQUIFAX and EXPERIAN, those consumer reporting agencies have included the negative and inaccurate BARCLAYS/APPLE ACCOUNT information in each and every credit report they have published about the Plaintiff since approximately 2015.

M.
BARCLAYS/APPLE'S CONDUCT WAS NEGLIGENT AND WILLFUL

282. BARCLAYS/APPLE'S failure to enact, maintain or enforce policies, and/or to properly train employees in order to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from BARCLAYS/APPLE, was negligent.

283. BARCLAYS/APPLE'S failure to enact, maintain or enforce policies, and/or to properly train employees in order to prevent, detect and/or mitigate identity theft; including, but not limited to a policy or policies intended to instruct employees on the process and procedures to be utilized in order to insure that the means of identification which they accept directly from potential customers actually belongs to the person presenting or submitting that means of identification and/or requesting credit from BARCLAYS/APPLE, was willful.

284. BARCLAYS/APPLE's failure and/or refusal to delete the BARCLAYS/APPLE ACCOUNT from the PLAINTIFF's credit reports, even after having been properly notified about the Plaintiff's disputes and his claims of identity fraud was negligent.

- 67 -

285. BARCLAYS/APPLE failure and/or refusal to delete the BARCLAYS/APPLE ACCOUNT from the PLAINTIFF's credit reports, even after having been properly notified about the Plaintiff's disputes and claims of identity fraud was willful.

286. - 289. RESERVED.

..........

- 68 -

XIV
TATE & KIRLAN ASSOCIATES, INC.

A
BUSINESS MODEL

290. TATE is a debt collection agency licensed by the Rhode Island Department of Business Regulation, pursuant to the Rhode Island Fair Debt Collection Practices Act (R.I.G.L. § 19-14.9-12(1), whose primary purpose is the collection and/or attempted collection of consumer debt incurred primarily for personal, family and/or household purposes.

291. Upon information and belief, TATE obtains the standing to collect delinquent consumer debts either by purchasing the accounts outright, or taking an assignment of the debt for the purposes of attempting to collect those debts as a third party.

292. Upon information and belief, TATE receives assignment (by outright purchase or otherwise) of hundreds, if not thousands, of allegedly delinquent consumer accounts at one time, in packages known as "debt portfolios".

293. Upon information and belief, contained within each debt portfolio assigned to TATE (by outright purchase or otherwise) is limited biographical information about the alleged debtors, including, but not limited to, the debtor's name, date of birth, social security number (i.e. their "means of identification"), address, recent payment history, the amount of the debt, and contact information identifying the original creditor.

294. Upon information and belief, prior to receiving assignment (by purchase or otherwise) of the delinquent accounts it intends to collect as a third party, TATE does NOT obtain, review, inspect or otherwise consult any documentation generated at the time of the original credit transaction (when the

-69-

account was actually opened with the credit grantor) (i.e. credit applications, bills of sale, financing terms, sales receipts or invoices).

295. Upon information and belief, at the time TATE accepts assignment of the allegedly delinquent accounts (by purchase or otherwise) they are relying completely on the assurances and/or warranties of the assignors of those accounts as to the identity of the debtors alleged to be responsible for the repayment of those accounts, as well as those particular debtors' involvement in the original credit transaction giving rise to the delinquent accounts.

296. Upon information and belief, once TATE purchases a debt portfolio, it takes automatic steps to determine (a) if those accounts are collectable and (b) how to collect them.

(1)
15 U.S.C. § 1681b(a)(3)(A)

297. Upon information and belief, as primary means of determining the collectability of the accounts contained within the debt portfolios they purchase accept or receive assignment of, TATE obtains a credit report (and/or credit score) about each new debtor contained in those portfolios, as a springboard to other collection activity (i.e. collection letters, collection calls, and/or court complaints).

298. Upon information and belief, utilizing information culled from the credit reports it obtains, TATE updates the contact information contained in its internal files, assess a debtor's ability to pay (or TATE's ability to reach and attach wages or execute against other assets), and thereafter categorizes a particular debt as either collectable or uncollectable, before proceeding with industry standard collection activities.

(a)
TATE'S IMPERMISSIBLE INQUIRIES

299. On February 16, 2018, TATE transferred the Plaintiff's means of

-70-

identification, including, but not limited to, the Plaintiff's name, date of birth and social security number (or portions thereof) to TRANS UNION, via TATE's CRA-INTERFACE, and requested a credit report about the Plaintiff.

300. When TATE requested a credit report about the Plaintiff on February 16, 2018, it did not certify or list a permissible purpose for the individual request, and upon information and belief, its request was submitted to TRANS UNION based upon the blanket certification TATE provided when it subscribed to TRANS UNION (pursuant to 15 U.S.C. § 1681e(a)).

301. On February 16, 2018, relying upon the blanket certification TATE initially provided as to the permissible purpose for which it intended to use consumer credit reports, TRANS UNION prepared a credit report about the Plaintiff, and published that credit report to TATE via its CRA-INTERFACE.

302. On February 16, 2018, the Plaintiff was incarcerated in the Federal Bureau of Prisons, Federal Correctional Institution, Fort Dix, New Jersey.

(b)
PLAINTIFF'S DISCOVERY OF TATE'S INQUIRY

303. The Plaintiff discovered TATE's February 16, 2018, TRANS UNION inquiry on or about June 10, 2010, when he received a copy of his Trans Union credit report dated June 06, 2010.

304. The Plaintiff has never applied for credit from TATE, and does not have an account with TATE and has never been a customer of TATE.

305. TATE is not a judgement creditor of the Plaintiff, and never has been a judgment creditor of the Plaintiff.

306. The Plaintiff did not authorize TATE to obtain his credit report on February 16, 2018, or on any other date, from TRANS UNION or any other source.

(c)
PLAINTIFF'S REQUEST FOR EXPLANATION FROM TATE

307. Because the details section of the Plaintiff's credit report did not

-71-

include the nature and purpose of TATE's February 16, 2018, inquiry, the Plaintiff contacted the Rhode Island Secretary of State and requested corporate information about TATE.

308. On or about June 25, 2018, the Rhode Island Secretary of State furnished corporate information about TATE to the Plaintiff, via regular United States Mail, and that information served as the basis for the Plaintiff's knowledge that TATE was actually a collection agency.

309. The Plaintiff sent, via regular mail, three letters to TATE, in each of which letter the Plaintiff demanded to know the nature and purpose of TATE's February 16, 2018, TRANS UNION inquiry, the most recent of which was dispatched on August 25, 2019, to TATE via its registered agent in Rhode Island.

310. TATE has never responded to the Plaintiff's request for information.

(2)
15 U.S.C. § 1681(a)(3)(E)

311. The Plaintiff restates and realleges the contents of paragraphs 290 - 310, above, with full force and effect, as though fully set forth here.

312. Upon information and belief, and in the alternative, the Plaintiff alleges that TATE impermissibly obtained the Plaintiff's credit report from TRANS UNION on February 16, 2018, for the purposes of deciding whether or not to purchase, as an investment, an allegedly delinquent account, alleged to belong to the Plaintiff, whereas 15 U.S.C. § 1681(a)(3)(A) neither contemplates, nor authorizes a person to obtain a credit report, as a potential investor in an account, the origination of which, did not INVOLVE the Plaintiff, as opposed to obtaining that credit report as a means of attempting to collect a debt which it already owned.

313. And, in the event that TATE did obtain the Plaintiff's credit report from TRANS UNION on February 16, 2018, as a potential investor in a delinquent

-72-

account allegedly owed by the Plaintiff. TATE, nevertheless induced TRANS UNION to prepare and publish that credit report about the Plaintiff by (a) first providing Plaintiff's means of identification to - which TATE had no legal right to possess, transfer and/or use - to TRANS UNION, and (2) by certifying to TRANS UNION that it was obtaining that credit report for the purposes of "COLLECTION" rather than disclosing that it was actually obtaining that credit report in order to evaluate a potential investment, which constitutes obtaining a credit report under false pretenses.

314. - 319.   RESERVED.

**********

-73-

## XV
## DEBTSY, INC.

### A
### BUSINESS MODEL

320. DEBTSY is as debt collection agency licensed by the Rhode Island Department of Business Regulation, pursuant to the Rhode Island Fair Debt Collection Practices Act (R.I.G.L. § 19-14.9-12(1), whose primary purpose is the collection and/or attempted collection of consumer debt incurred primarily for personal, family and/or household purposes.

321. Upon information and belief, DEBTSY obtains the standing to collect delinquent consumer debts either by purchasing the accounts outright, or taking an assignment of the debt for the purposes of attempting to collect those debts as a third party.

322. Upon information and belief, DEBTSY receives assignment (by outright purchase or otherwise) of hundreds, if not thousands, of allegedly delinquent consumer accounts at one time, in packages known as "debt portfolios".

323. Upon information and belief, contained within each debt portfolio assigned to DEBTSY (by outright purchase or otherwise) is limited biographical information about the alleged debtors, including, but not limited to, the debtor's name, date of birth, social security number (i.e. their "means of identification"), address, recent payment history, the amount of the debt, and contact information identifying the original creditor.

324. Upon information and belief, prior to receiving assignment (by purchase or otherwise) of the delinquent accounts it intends to collect as a third party, DEBTSY does NOT obtain, review, inspect or otherwise consult any documentation generated at the time of the original credit transaction (when the

-74-

account was actually opened with the credit grantor) (i.e. credit applications, bills of sale, financing terms, sales receipts or invoices).

325. Upon information and belief, at the time DEBTSY accepts assignment of the allegedly delinquent accounts (by purchase or otherwise) they are relying completely on the assurances and/or warranties of the assignors of those accounts as to the identity of the debtors alleged to be responsible for the repayment of those accounts, as well as those particular debtors' involvement in the original credit transaction giving rise to the delinquent accounts.

326. Upon information and belief, once DEBTSY purchases a debt portfolio, it takes automatic steps to determine (a) if those accounts are collectable and (b) how to collect them.

#### (1)
#### 15 U.S.C. § 1681b(a)(3)(A)

327. Upon information and belief, as primary means of determining the collectability of the accounts contained within the debt portfolios they purchase accept or receive assignment of, DEBTSY obtains a credit report (and/or credit score) about each new debtor contained in those portfolios, as a springboard to other collection activity. (i.e. collection letters, collection calls, and/or court complaints).

328. Upon information and belief, utilizing information culled from the credit reports it obtains, DEBTSY updates the contact information contained in its internal files, assess a debtor's ability to pay (or DEBTSY's ability to reach and attach wages or execute against other assets), and thereafter categorizes a particular debt as either collectable or uncollectable, before proceeding with industry standard collection activities.

#### (a)
#### DEBTSY'S IMPERMISSIBLE INQUIRIES

329. On January 17, 2018, DEBTSY transferred the Plaintiff's means of

-75-

identification, including, but not limited to, the Plaintiff's name, date of birth and social security number (or portions thereof) to EXPERIAN, via DEBTSY's CRA-INTERFACE, and requested a credit report about the Plaintiff.

330. When DEBTSY requested a credit report about the Plaintiff on January 17, 2018, it did not certify or list a permissible purpose for the individual request, and upon information and belief, its request was submitted to EXPERIAN based upon the blanket certification DEBTSY provided when it subscribed to EXPERIAN (pursuant to 15 U.S.C. § 1681e(a)).

331. On January 17, 2018, relying upon the blanket certification DEBTSY initially provided as to the permissible purpose for which it intended to use consumer credit reports, EXPERIAN prepared a credit report about the Plaintiff, and published that credit report to DEBTSY via its CRA-INTERFACE.

332. On January 17, 2018, the Plaintiff was incarcerated in the Federal Bureau of Prisons, Federal Correctional Institute, Fort Dix, New Jersey.

#### (b)
#### PLAINTIFF'S DISCOVERY OF THE DEBTSY'S INQUIRY

333. The Plaintiff discovered DEBTSY's January 17, 2018, EXPERIAN inquiry on or about June 18, 2018, when he received a copy of his Trans Union credit report dated June 06, 2018.

334. The Plaintiff has never applied for credit from DEBTSY, and does not have an account with DEBTSY and has never been a customer of DEBTSY.

335. DEBTSY is not a judgement creditor of the Plaintiff, and never has been a judgment creditor of the Plaintiff.

336. The Plaintiff did not authorize DEBTSY to obtain his credit report on January 17, 2018, or on any other date, from EXPERIAN or any other source.

#### (c)
#### PLAINTIFF'S REQUEST FOR EXPLANATION FROM DEBTSY

337. Because the details section of the Plaintiff's credit report did not

-76-

include the nature and purpose of DEBTSY's January 17, 2018, inquiry, the Plaintiff contacted the Rhode Island Secretary of State and requested corporate information about DEBTSY.

338. On or about January 05, 2018, the Rhode Island Secretary of State furnished corporate information about DEBTSY to the Plaintiff, via regular United States Mail, and that information served as the basis for the Plaintiff's knowledge that DEBTSY was actually a collection agency.

339. The Plaintiff sent, via regular mail, three letters to DEBTSY, in each of which letter the Plaintiff demanded to know the nature and purpose of DEBTSY's January 17, 2018, EXPERIAN inquiry, the most recent of which was dispatched on August 25, 2019, to DEBTSY via its registered agent in Rhode Island.

340. DEBTSY has never responded to the Plaintiff's request for information.

(2)<br>15 U.S.C. § 1681(a)(3)(E)

341. The Plaintiff restates and realleges the contents of paragraphs 320 - 340, above, with full force and effect, as though fully set forth here.

342. Upon information and belief, and in the alternative, the Plaintiff alleges that DEBTSY impermissibly obtained the Plaintiff's credit report from EXPERIAN on January 17, 2018, for the purposes of deciding whether or not to purchase, as an investment, an allegedly delinquent account, alleged to belong to the Plaintiff, whereas 15 U.S.C. § 1681(a)(3)(A) neither contemplates, nor authorizes a person to obtain a credit report, as as potential investor in an account, the origination of which, did not INVOLVE the Plaintiff, as opposed to obtaining that credit report as a means of attempting to collect a debt which it already owned.

343. And, in the event that DEBTSY did obtain the Plaintiff's credit report

- 77 -

from EXPERIAN on January 17, 2018, as a potential investor in a delinquent account allegedly owed by the Plaintiff, DEBTSY, nevertheless induced EXPERIAN to prepare and publish that credit report about the Plaintiff by (a) first providing Plaintiff's means of identification to - which DEBTSY had no legal right to possess, transfer and/or use - to EXPERIAN, and (2) by certifying to EXPERIAN that it was obtaining that credit report for the purposes of "COLLECTION" rather than disclosing that it was actually obtaining that credit report in order to evaluate a potential investment, which constitutes obtaining a credit report under false pretenses.

344. - 349.   RESERVED.

**********

- 78 -

XVI<br>AFNI, INC.

A<br>BUSINESS MODEL

350. AFNI is a debt collection agency licensed by the Rhode Island Department of Business Regulation, pursuant to the Rhode Island Fair Debt Collection Practices Act (R.I.G.L. § 19-14.9-12(1), whose primary purpose is the collection and/or attempted collection of consumer debt incurred primarily for personal, family and/or household purposes.

351. Upon information and belief, AFNI obtains the standing to collect delinquent consumer debts either by purchasing the accounts outright, or taking an assignment of the debt for the purposes of attempting to collect those debts as a third party.

352. Upon information and belief, AFNI receives assignment (by outright purchase or otherwise) of hundreds, if not thousands, of allegedly delinquent consumer accounts at one time, in packages known as "debt portfolios".

353. Upon information and belief, contained within each debt portfolio assigned to AFNI (by outright purchase or otherwise) is limited biographical information about the alleged debtors, including, but not limited to, the debtor's name, date of birth, social security number (i.e. their "means of identification"), address, recent payment history, the amount of the debt, and contact information identifying the original creditor.

354. Upon information and belief, prior to receiving assignment (by purchase or otherwise) of the delinquent accounts it intends to collect as a third party, AFNI does NOT obtain, review, inspect or otherwise consult any documentation generated at the time of the original credit transaction (when the

- 79 -

account was actually opened with the credit grantor) (i.e. credit applications, bills of sale, financing terms, sales receipts or invoices).

355. Upon information and belief, at the time AFNI accepts assignment of the allegedly delinquent accounts (by purchase or otherwise) they are relying completely on the assurances and/or warranties of the assignors of those accounts as to the identity of the debtors alleged to be responsible for the repayment of those accounts, as well as those particular debtors' involvement in the original credit transaction giving rise to the delinquent accounts.

356. Upon information and belief, once AFNI purchases a debt portfolio, it takes automatic steps to determine (a) if those accounts are collectable and (b) how to collect them.

(1)<br>15 U.S.C. § 1681b(a)(3)(A)

357. Upon information and belief, as primary means of determining the collectability of the accounts contained within the debt portfolios they purchase accept or receive assignment of, AFNI obtains a credit report (and/or credit score) about each new debtor contained in those portfolios, as a springboard to other collection activity (i.e. collection letters, collection calls, and/or court complaints).

358. Upon information and belief, utilizing information culled from the credit reports it obtains, AFNI updates the contact information contained in its internal files, assess a debtor's ability to pay (or AFNI's ability to reach and attach wages or execute against other assets), and thereafter categorizes a particular debt as either collectable or uncollectable, before proceeding with industry standard collection activities.

(a)<br>AFNI'S IMPERMISSIBLE INQUIRIES

359. On February 02, 2018, AFNI transferred the Plaintiff's means of

- 80 -

identification, including, but not limited to, the Plaintiff's name, date of birth and social security number (or portions thereof) to TRANS UNION, via AFNI's CRA-INTERFACE, and requested a credit report about the Plaintiff.

360. When AFNI requested a credit report about the Plaintiff on February 02, 2018, it did not certify or list a permissible purpose for the individual request, and upon information and belief, its request was submitted to TRANS UNION based upon the blanket certification AFNI provided when it subscribed to TRANS UNION (pursuant to 15 U.S.C. § 1681e(a)).

361. On February 02, 2018, relying upon the blanket certification AFNI initially provided as to the permissible purpose for which it intended to use consumer credit reports, TRANS UNION prepared a credit report about the Plaintiff, and published that credit report to AFNI via its CRA-INTERFACE.

362. On February 02, 2018, the Plaintiff was incarcerated in the Federal Bureau of Prisons, Federal Correctional Institute, Fort Dix, New Jersey.

### (b)
### PLAINTIFF'S DISCOVERY OF AFNI'S INQUIRY

363. The Plaintiff discovered AFNI's February 02, 2018, TRANS UNION inquiry on or about June 18, 2018, when he received a copy of his Trans Union credit report dated June 06, 2018.

364. The Plaintiff has never applied for credit from AFNI, and does not have an account with AFNI and has never been a customer of AFNI.

365. AFNI is not a judgement creditor of the Plaintiff, and never has been a judgment creditor of the Plaintiff.

366. The Plaintiff did not authorize AFNI to obtain his credit report on February 02, 2018, or on any other date, from TRANS UNION or any other source.

### (c)
### PLAINTIFF'S REQUEST FOR EXPLANATION FROM AFNI

367. Between approximately June 15, 2018, and August 25, 2019, the

-81-

Plaintiff attempted to ascertain the nature and purpose of AFNI's February 02, 2018, inquiry, however, after a number of email communications with AFNI's outside counsel, and (b) two separate Notices of Intent to Sue sent to AFNI (at least one of which was via its registered agent in Rhode Island), AFNI has failed and/or refused to identify the precise reason that AFNI obtained his credit report, including refusing to provide the name and contact information of any original creditor, or the amount of the debt it alleges the Plaintiff is responsible to pay.

368. To the extent that AFNI failed and/or refused to identify the nature and purpose of its February 02, 2018, inquiry, AFNI has also failed to validate whatever (if any) debt it is attempting to collect in connection with its inquiry.

### (2)
### 15 U.S.C. § 1681(a)(3)(E)

369. The Plaintiff restates and realleges the contents of paragraphs 350 - 368, above, with full force and effect, as though fully set forth here.

370. Upon information and belief, and in the alternative, the Plaintiff alleges that AFNI impermissibly obtained the Plaintiff's credit report from TRANS UNION on February 02, 2018, for the purposes of deciding whether or not to purchase, as an investment, an allegedly delinquent account, alleged to belong to the Plaintiff, whereas 15 U.S.C. § 1681(a)(3)(A) neither contemplates, nor authorizes a person to obtain a credit report, as a potential investor in an account, the origination of which, did not INVOLVE the Plaintiff, as opposed to obtaining that credit report as a means of attempting to collect a debt which it already owned.

371. And, in the event that AFNI did obtain the Plaintiff's credit report from TRANS UNION on February 02, 2018, as a potential investor in a delinquent account allegedly owed by the Plaintiff, AFNI, nevertheless induced TRANS UNION

-82-

to prepare and publish that credit report about the Plaintiff by (a) first providing Plaintiff's means of identification to - which AFNI had no legal right to possess, transfer and/or use - to TRANS UNION, and (2) by certifying to TRANS UNION that it was obtaining that credit report for the purposes of "COLLECTION" rather than disclosing that it was actually obtaining that credit report in order to evaluate a potential investment, which constitutes obtaining a credit report under false pretenses.

372. - 374. RESERVED.

•••••••••

-83-

### FIRST CAUSE OF ACTION
### OBTAINING CONSUMER CREDIT REPORTS WITHOUT A PERMISSIBLE PURPOSE AND/OR UNDER FALSE PRETENSES
### (15 U.S.C. §§ 1681b, 1681n, 1681o, 1681q)

375. The Plaintiff restates and realleges the contents of the above-numbered paragraphs, with full force and effect, as though fully set forth here.

### [A]
### STATUTE AUTHORIZING CREDIT REPORT ACCESS

"A credit inquiry is only permissible under § 1681b(a)(3)(A) if the requestor intends to use the information in connection with a credit transaction involving the collection of an account of [] the consumer. 15 U.S.C. § 1681b(a)(3)(A)(emphasis added); see also Pintos v. Pacific Creditors Ass'n, 605 F.3d 665, 674--75 (9th Cir. 2009)(holding that credit checks under § 1681b(a)(3)(A) are authorized only when the person whose credit is being checked is drawn in as a participant); Stergiopoulos v. First Midwest Bancorp, Inc. 427 F.3d 1043, 1047 (7th Cir. 2005)(credit report request is proper only if the consumer initiates the transaction). Susan Searle v. RGS Financial, Inc., 2014 U.S. Dist. LEXIS 18324) (U.S.D. Mass. 2014 (internal quotations omitted).

### [B]
### DISCOVER FINANCIAL SERVICES, LLC

376. On at least twenty-six (26) separate and distinct instances between July 09, 2017 and August 09, 2019, DISCOVER requested and obtained the Plaintiff's credit report by certifying to TRANS UNION that it had a permissible purpose to do so (i.e. review of the DISCOVER ACCOUNT), when DISCOVER knew, should have known, or consciously avoided knowing, (1) that the Plaintiff filed multiple disputes of the DISCOVER ACCOUNT as being the product of identity theft; (2) that DISCOVER's knowledge of Plaintiff's disputes was premised upon (1) FCRA complaint notices received by Discover directly from TRANS UNION and

-84-

(ii) information the Plaintiff provided to directly to DISCOVER, upon DISCOVER's written request; and (3) that DISCOVER did not make any efforts to independently investigate the disputes submitted to DISCOVER by TRANS UNION, including, but not limited to the Plaintiff's assertion of identity fraud or the fact that the Plaintiff was incarcerated.

377. The Plaintiff became aware that DISCOVER obtained the twenty Seven (27) Credit Reports referred to in paragraph 351, above upon receiving copies of his TRANS UNION credit report dated June 06, 2018 (on approximately June 18, 2018), July 06, 2018 (on approximately July 12, 2018), July 29, 2019 (on August 8, 2019), and September 10, 2019 (on September 18, 2019), respectively.

COUNT ONE

378. On July 09, 2017, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly and willfully, obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

COUNT TWO

379. On August 09, 2017, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the

- 85 -

Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

COUNT THREE

380. On September 09, 2017, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

COUNT FOUR

381. On October 09, 2017, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report

- 86 -

without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

COUNT SEVEN

382. On November 09, 2017, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q .

COUNT SIX

383. On December 09, 2017, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

- 87 -

COUNT SEVEN

384. On January 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

COUNT EIGHT

385. On February 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

COUNT NINE

386. On March 09, 2018, DISCOVER negligently and/or willfully did induce

- 88 -

TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

<u>COUNT TEN</u>

387. On April 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

<u>COUNT ELEVEN</u>

388. On May 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the

Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and /or 1681q.

<u>COUNT TWELVE</u>

389. On June 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

<u>COUNT THIRTEEN</u>

390. On July 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report

without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

<u>COUNT FOURTEEN</u>

391. On August 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

<u>COUNT FIFTEEN</u>

392. On September 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or

1681q.

<u>COUNT SIXTEEN</u>

393. On October 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

<u>COUNT SEVENTEEN</u>

394. On November 09, 2018, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

<u>COUNT EIGHTEEN</u>

395. On December 09, 2018, DISCOVER negligently and/or willfully did induce

TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o 1681p and/or 1681q.

### COUNT NINETEEN

396. On January 09, 2019, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681d, 1681p and/or 1681q.

### COUNT TWENTY

412. On February 09, 2019, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the

Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

### COUNT TWENTY-ONE

398. On March 09, 2019, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

### COUNT TWENTY-TWO

399. On AUGUST 09, 2019, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report

without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o 1681p and/or 1681q.

### COUNT TWENTY-THREE

400. On May 09, 2019, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o 1681p and/or 1681q.

### COUNT TWENTY-FOUR

401. On June 09, 2019, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o 1681p and/or

1681q.

### COUNT TWENTY-FIVE

402. On July 09, 2019, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

### COUNT TWENTY-SIX

403. On AUGUST 09, 2019, DISCOVER negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

[8]
### BARCLAYS BANK DELAWARE

404. On at least eight separate and distinct instances between July 15,

2016 and August 09, 2019, BARCLAYS requested and obtained the Plaintiff's credit report by certifying to TRANS UNION that it had a permissible purpose to do so (i.e. review of the BARCLAYS ACCOUNT), when BARCLAYS knew, should have known, or consciously avoided knowing (1) that the Plaintiff filed multiple disputes of the BARCLAYS account as being the product of identity theft; (2) that BARCLAYS' knowledge of Plaintiff's disputes was premised upon FCRA compliant notices received by BARCLAYS directly from TRANS UNION; and (3) that BARCLAYS did not make any efforts to independently investigate the disputes submitted to BARCLAYS by TRANS UNION, including, but not limited to the Plaintiff's assertion of identity fraud or the fact that the Plaintiff was incarcerated.

405.    The Plaintiff became aware that BARCLAYS obtained the eight (8) credit report referred to in paragraph 272, above, upon receiving copies of his TRANS UNION credit reports dated July 06, 2018, July 29, 2019 and September 10, 2019.

#### COUNT TWENTY-SEVEN

406.    On July 15, 2016, BARCLAY negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

- 97 -

#### COUNT TWENTY-EIGHT

407.    On May 11, 2017, BARCLAYS negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

#### COUNT TWENTY-NINE

408.    On August 20, 2017, BARCLAYS negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DISCOVER was reviewing the DISCOVER ACCOUNT, when DISCOVER knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL DISCOVER CREDIT TRANSACTION, and that the DISCOVER ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

#### COUNT THIRTY

409.    On December 30, 2017, BARCLAYS negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the

- 98 -

Plaintiff by certifying that BARCLAYS was reviewing the BARCLAYS ACCOUNT, when BARCLAYS knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL BARCLAYS CREDIT TRANSACTION, and that the BARCLAYS ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

#### COUNT THIRTY-ONE

410.    On April 20, 2018, BARCLAYS negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that BARCLAYS was reviewing the BARCLAYS ACCOUNT, when BARCLAYS knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL BARCLAYS CREDIT TRANSACTION, and that the BARCLAYS ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

#### COUNT THIRTY-TWO

411.    On August 24, 2018, BARCLAYS negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that BARCLAYS was reviewing the BARCLAYS ACCOUNT, when BARCLAYS knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL BARCLAYS CREDIT TRANSACTION, and that

- 99 -

the BARCLAYS ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

#### COUNT THIRTY-THREE

412.    On December 07, 2018, BARCLAYS negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that BARCLAYS was reviewing the BARCLAYS ACCOUNT, when BARCLAYS knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL BARCLAYS CREDIT TRANSACTION, and that the BARCLAYS ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

#### COUNT THIRTY-FOUR

413.    On April 12, 2019, BARCLAYS negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that BARCLAYS was reviewing the BARCLAYS ACCOUNT, when BARCLAYS knew, should have known, or consciously avoided knowing, that the Plaintiff was not involved in the ORIGINAL BARCLAYS CREDIT TRANSACTION, and that the BARCLAYS ACCOUNT was the result of identity fraud, each and every act or omission alleged herein constituting knowingly obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false

- 100 -

pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

**[D]**
**TATE & KIRLAN ASSOCIATES, INC.**

**COUNT THRITY-FIVE**

414. On February 16, 2018, TATE negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that TATE had a permissible purpose for doing so, when TATE knew, should have known, or consciously avoided knowing that (1) the Plaintiff was not a judgment debtor of TATE, (2) that the Plaintiff did not request credit or insurance from TATE, (3) that TATE did not extend a firm offer of credit or insurance to the Plaintiff, (4) that the Plaintiff did not otherwise authorize TATE to obtain his credit report, and, (5) in the event that TATE alleges that it obtained the Plaintiff's credit report in an attempt to collect a debt allegedly owed by the Plaintiff, TATE knew, should have known, or consciously avoided knowing that the Plaintiff was not involved in any credit transaction with any original creditor, and that TATE failed or otherwise refused to take reasonable steps to insure the Plaintiff's involvement in any credit transaction before inducing TRANS UNION to prepare and publish a confidential credit report about the Plaintiff, each and every act or omission alleged herein constituting knowingly and willfully obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

**[E]**
**DEBTSY, INC.**

-101-

---

**COUNT THIRTY-SIX**

415. On January 17, 2018, DEBTSY negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that DEBTSY had a permissible purpose for doing so, when DEBTSY knew, should have known, or consciously avoided knowing that (1) the Plaintiff was not a judgment debtor of DEBTSY, (2) that the Plaintiff did not request credit or insurance from DEBTSY, (3) that DEBTSY did not extend a firm offer of credit or insurance to the Plaintiff, (4) that the Plaintiff did not otherwise authorize DEBTSY to obtain his credit report, and, (5) in the event that DEBTSY alleges that it obtained the Plaintiff's credit report in an attempt to collect a debt allegedly owed by the Plaintiff, DEBTSY knew, should have known, or consciously avoided knowing that the Plaintiff was not involved in any credit transaction with any original creditor, and that DEBTSY failed or otherwise refused to take reasonable steps to insure the Plaintiff's involvement in any credit transaction before inducing TRANS UNION to prepare and publish a confidential credit report about the Plaintiff, each and every act or omission alleged herein constituting knowingly and willfully obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

**[F]**
**AFNI, INC.**

**COUNT THIRTY-SEVEN**

416. On February 02, 2018, AFNI negligently and/or willfully did induce TRANS UNION to prepare and publish a confidential credit report about the Plaintiff by certifying that AFNI had a permissible purpose for doing so, when AFNI knew, should have known, or consciously avoided knowing that (1) the

-102-

---

Plaintiff was not a judgment debtor of AFNI, (2) that the Plaintiff did not request credit or insurance from AFNI, (3) that AFNI did not extend a firm offer of credit or insurance to the Plaintiff, (4) that the Plaintiff did not otherwise authorize AFNI to obtain his credit report, and, (5) in the event that AFNI alleges that it obtained the Plaintiff's credit report in an attempt to collect a debt allegedly owed by the Plaintiff, AFNI knew, should have known, or consciously avoided knowing that the Plaintiff was not involved in any credit transaction with any original creditor, and that AFNI failed or otherwise refused to take reasonable steps to insure the Plaintiff's involvement in any credit transaction before inducing TRANS UNION to prepare and publish a confidential credit report about the Plaintiff, each and every act or omission alleged herein constituting knowingly and willfully obtaining a consumer report without a permissible purpose and/or obtaining a consumer report under false pretenses, and thus each and every act or omission alleged herein being in violation of the Fair Credit Reporting Act, §§ 1681b, 1681n, 1681o, 1681p and/or 1681q.

··········

-103-

---

**SECOND CAUSE OF ACTION**
**FAILING TO CONDUCT REASONABLE AND ADEQUATE**
**INVESTIGATIONS OF FCRA COMPLIANT DISPUTES**
**(15 U.S.C. § 1681s-2(b)**

417. The Plaintiff restates and realleges the contents of the above-numbered paragraphs, with full force and effect, as though fully set forth here.

**[A]**
**STATUTE REQUIRING INVESTIGATION BY FURNISHERS**

"The Fair Credit Reporting Act imposes certain obligations on entities that furnish credit information to consumer reporting agencies (CRRAs). See. 15 U.S.C. § 1681s-2. One such obligation is to investigate any disputes over the completeness or accuracy of the information furnished and then notify the CRA of any corrections -- but only if the CRA, acting as gatekeeper, has previously notified the furnisher of the consumer's disputes. Id. § 1681s-2(b)(1). By contrast, "[a] notice of disputed information provided directly by the consumer to a furnisher does not trigger a furnisher's duties under § 1681s-2(b)." Chiang v. Verizon New England, Inc., 595 F.3d 26, 35 n.8 (1st Cir. 2010).

**[B]**
**DISCOVER FINANCIAL SERVICES, LLC**

**COUNT THIRTY-EIGHT**

418. DISCOVER is a "furnisher" of information to consumer reporting agencies insofar as, in the ordinary course of business, it regularly furnishes information to EXPERIAN, TRANS UNION and/or EQUIFAX about its relationships with individual consumers.

419. As a "furnisher" of information to consumer reporting agencies, DISCOVER is subject to the requirements of 15 U.S.C. § 1681s-2(b), governing the duty of "furnishers" of information to consumer reporting agencies to conduct a reasonable investigation of disputes received directly from a consumer reporting agency.

-104-

420. DISCOVER failed or otherwise refused to conduct a reasonable investigation of the DISCOVER ACCOUNT which it has, and continues to report to one or more consumer reporting agency, notwithstanding the fact that (1) DISCOVER received timely and FCRA compliant notices of the Plaintiff's dispute of the DISCOVER ACCOUNT from EXPERIAN, TRANS UNION and/or EQUIFAX (as set forth in ¶¶ 93-95, above), including notice of the Plaintiff's assertion of identity fraud, and (2) DISCOVER requested and received details and information supporting the Plaintiff's dispute, directly from the Plaintiff.

421. DISCOVER'S investigation(s) (if any) were canned, robotic and unreasonable in that they failed to investigate or confirm the information furnished by EXPERIAN, TRANS UNION and EQUIFAX; namely that the Plaintiff asserted that he was incarcerated and has been the victim of identity fraud, but instead DISCOVER'S canned, robotic and unreasonable investigations consisted of nothing more than comparing the means of identification contained in their internal files, against the means of identification contained within the four corners of the dispute notifications provided by EXPERIAN, TRANS UNION and EQUIFAX, and such negligent and willful conduct has resulted in the continued reporting of negative and inaccurate information about the Plaintiff to consumer reporting agencies.

[C]
#### MACY'S RETAIL HOLDINGS, INC. & FDS BANK, FSB

#### COUNT THIRTY-NINE

422. MACY'S and FDS are each a "furnisher" of information to consumer reporting agencies insofar as, in the ordinary course of business, it regularly furnishes information to EXPERIAN, TRANS UNION and/or EQUIFAX about its relationships with individual consumers.

423. As a "furnisher" of information to consumer reporting agencies, MACY'S and FDS are subject to the requirements of 15 U.S.C. § 1681s-2(b),

-105-

---

governing the duty of "furnishers" of information to consumer reporting agencies to conduct a reasonable investigation of disputes received directly from a consumer reporting agency.

424. MACY'S and FDS failed or otherwise refused to conduct a reasonable investigation of the MACY'S ACCOUNT which it has, and continues to report to one or more consumer reporting agency, notwithstanding the fact that (1) DISCOVER received timely and FCRA compliant notices of the Plaintiff's dispute of the DISCOVER ACCOUNT from EXPERIAN, TRANS UNION and/or EQUIFAX (as set forth in ¶¶ 149-151, above), including notice of the Plaintiff's assertion of identity fraud, and (2) MACY'S and FDS requested and received details and information supporting the Plaintiff's dispute, directly from the Plaintiff.

425. MACY'S and FDS's investigation(s) (if any) were canned, robotic and unreasonable in that they failed to investigate or confirm the information furnished by EXPERIAN, TRANS UNION and EQUIFAX; namely that the Plaintiff asserted that he was incarcerated and has been the victim of identity fraud, but instead MACY'S canned, robotic and unreasonable investigations consisted of nothing more than comparing the means of identification contained in their internal files, against the means of identification contained within the four corners of the dispute notifications provided by EXPERIAN, TRANS UNION and EQUIFAX, and such negligent and willful conduct has resulted in the continued reporting of negative and inaccurate information about the Plaintiff to consumer reporting agencies.

[D]
#### TARGET CORP., TARGET AND TD BANK

#### COUNT FORTY

426. TARGET CORP., TARGET and TD BANK are each a "furnisher" of information to consumer reporting agencies insofar as, in the ordinary course of business, it regularly furnishes information to EXPERIAN, TRANS UNION and/or

-106-

---

EQUIFAX about its relationships with individual consumers.

427. As a "furnisher" of information to consumer reporting agencies, TARGET CORP., TARGET and TD BANK are subject to the requirements of 15 U.S.C. § 1681s-2(b), governing the duty of "furnishers" of information to consumer reporting agencies to conduct a reasonable investigation of disputes received directly from a consumer reporting agency.

428. TARGET CORP., TARGET and TD BANK failed or otherwise refused to conduct a reasonable investigation of the TARGET ACCOUNT which it has, and continues to report to one or more consumer reporting agency, notwithstanding the fact that (1) TARGET CORP., TARGET and TD BANK received timely and FCRA compliant notices of the Plaintiff's dispute of the TARGET ACCOUNT from EXPERIAN, TRANS UNION and/or EQUIFAX (as set forth in ¶¶ 219-221, above), including notice of the Plaintiff's assertion of identity fraud, and (2) TARGET CORP, TARGET AND TD BANK requested and received details and information supporting the Plaintiff's dispute, directly from the Plaintiff.

429. TARGET'S, investigation(s) (if any) were canned, robotic and unreasonable in that they failed to investigate or confirm the information furnished by EXPERIAN, TRANS UNION and EQUIFAX; namely that the Plaintiff asserted that he was incarcerated and has been the victim of identity fraud, but instead TARGET CORP.'S, TARGET'S and TD BANK'S canned, robotic and unreasonable investigations consisted of nothing more than comparing the means of identification contained in their internal files, against the means of identification contained within the four corners of the dispute notifications provided by EXPERIAN, TRANS UNION and EQUIFAX, and such negligent and willful conduct has resulted in the continued reporting of negative and inaccurate information about the Plaintiff to consumer reporting agencies.

[E]
#### BARCLAYS BANK DELAWARE

-107-

---

#### COUNT FORTY-ONE

430. BARCLAYS is a "furnisher" of information to consumer reporting agencies insofar as, in the ordinary course of business, it regularly furnishes information to EXPERIAN, TRANS UNION and/or EQUIFAX about its relationships with individual consumers.

431. As a "furnisher" of information to consumer reporting agencies, BARCLAYS is subject to the requirements of 15 U.S.C. § 1681s-2(b), governing the duty of "furnishers" of information to consumer reporting agencies to conduct a reasonable investigation of disputes received directly from a consumer reporting agency.

432. BARCLAYS failed or otherwise refused to conduct a reasonable investigation of the BARCLAYS ACCOUNT which it has, and continues to report to one or more consumer reporting agency, notwithstanding the fact that BARCLAYS, received timely and FCRA compliant notices of the Plaintiff's dispute of the BARCLAYS ACCOUNT from EXPERIAN, TRANS UNION and/or EQUIFAX (as set forth in ¶¶ 263-265, above), including notice of the Plaintiff's assertion of identity fraud.

433. BARCLAYS' investigation(s) (if any) were canned, robotic and unreasonable in that they failed to investigate or confirm the information furnished by EXPERIAN, TRANS UNION and EQUIFAX; namely that the Plaintiff asserted that he was incarcerated and has been the victim of identity fraud, but instead BARCLAYS' canned, robotic and unreasonable investigations consisted of nothing more than comparing the means of identification contained in their internal files, against the means of identification contained within the four corners of the dispute notifications provided by EXPERIAN, TRANS UNION and EQUIFAX, and such negligent and willful conduct has resulted in the continued reporting of negative and inaccurate information about the Plaintiff to consumer reporting agencies.

..........

-108-

THIRD CAUSE OF ACTION
FAILING TO REPORT PLAINTIFF'S DISPUTE TO CRAs
(15 U.S.C. § 1681s-2(b)(1)(C)&(D))

434. The Plaintiff restates and realleges the contents of the above-numbered paragraphs, with full force and effect, as though fully set forth here.

[A]
STATUTE REQUIRING FURNISHERS TO REPORT
ACCOUNTS AS BEING DISPUTED BY THE CONSUMER
(15 U.S.C. § 1681s-2(a)(3))

"[I]f the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer." 15 U.S.C. § 1681s-2(a)(3). (emphasis added.) Carson v. Owen Loan Servicing, LLC, 2017 U.S. Dist. LEXIS 49263, citing Barrepaki v. Capital One Bank, 439 F. App'x 11, 12 (1st Cir. 2011).

COUNT FORTY-ONE
DISCOVER FINANCIAL SERVICES, LLC.

435. On numerous occasions between July of 2015 and the present, the Plaintiff notified EXPERIAN, TRANS UNION and EQUIFAX, that he continued to deny ownership of, use of, or any responsibility for paying, the DISCOVER ACCOUNT, and demanded that reporting of the DISCOVER ACCOUNT be terminated immediately and permanently.

436. In addition to reporting his continued dispute of the DISCOVER ACCOUNT to TRANS UNION, EXPERIAN and/or EQUIFAX, the Plaintiff also delivered notice of his continued dispute of the DISCOVER ACCOUNT directly to DISCOVER in the form of, inter alia, service upon DISCOVER and DISCOVER'S Registered Agent, of a Notice of Intent to Sue and a copy of a lawsuit which was filed in the United States District Court, for the Southern District of California, styled as Michael P. Tatro v. Sterling Jewelers, Inc. et al, Case Number: 3:17-1305-JAH.

-109-

437. DISCOVER has never responded to the Notice of Intent to Sue, and still has not entered an appearance in the California action.

438. DISCOVER knowingly and willfully failed or otherwise refused to report the DISCOVER ACCOUNT to TRANS UNION, EXPERIAN and/or EQUIFAX as disputed by the Plaintiff, even though DISCOVER received notice of the Plaintiff's disagreement with the results of the it reinvestigation of the DISCOVER ACCOUNT not only from TRANS UNION, EXPERIAN and/or EQUIFAX, but directly from the Plaintiff as well.

439. DISCOVER'S knowing and willful failure and/or refusal to report the DISCOVER ACCOUNT to TRANS UNION, EXPERIAN and/or EQUIFAX as disputed by the Plaintiff violated, and continues to violate, DISCOVER'S lawful duty and responsibility to report "incomplete or inaccurate" information under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(1)(C)&(D).

440. The Plaintiff's dispute of the DISCOVER ACCOUNT is bona fide in that he did not open, or authorize the opening of, the DISCOVER ACCOUNT, and therefore DISCOVER had no discretion to withhold notification to TRANS UNION, EXPERIAN, and/or EQUIFAX that the Plaintiff disputed the DISCOVER ACCOUNT.

COUNT FORTY-TWO
MACY'S RETAIL HOLDINGS, INC., and FDS BANK, FSB

441. On numerous occasions between July of 2015 and the present, the Plaintiff notified EXPERIAN, TRANS UNION and EQUIFAX, that he continued to deny ownership of, use of, or any responsibility for paying, the MACY'S ACCOUNT, and demanded that reporting of the MACY'S ACCOUNT be terminated immediately and permanently.

442. In addition to reporting his continued dispute of the MACY'S ACCOUNT to TRANS UNION, EXPERIAN and/or EQUIFAX, the Plaintiff also delivered notice of his continued dispute of the MACY'S ACCOUNT directly to MACY'S and FDS in the form of, inter alia, (1) communication between the Plaintiff and MACY'S Legal

-110-

Department (See, paragraphs 168-169, supra) and (2) service upon MACY'S and FDS' Registered Agent, of a Notice of Intent to Sue and a copy of a lawsuit which was filed in the United States District Court, for the Southern District of California, styled as Michael P. Tatro v. Sterling Jewelers, Inc. et al, Case Number: 3:17-1305-JAH, in which lawsuit MACY'S entered an appearance, through counsel, and has prosecuted a motion to dismiss on venue and jurisdiction grounds.

443. MACY'S and FDS knowingly and willfully failed or otherwise refused to report the MACY'S ACCOUNT to TRANS UNION, EXPERIAN and/or EQUIFAX as disputed by the Plaintiff.

444. MACY'S and FDS' knowing and willful failure and/or refusal to report the MACY'S ACCOUNT to TRANS UNION, EXPERIAN and/or EQUIFAX as disputed by the Plaintiff violated, and continues to violate, MACY'S and FDS' lawful duty and responsibility to report "incomplete or inaccurate" information under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(1)(C)&(D).

445. The Plaintiff's dispute of the MACY'S ACCOUNT is bona fide in that he did not open, or authorize the opening of, the MACY'S ACCOUNT, and therefore MACY'S and FDS had no discretion to withhold notification to TRANS UNION, EXPERIAN, and/or EQUIFAX that the Plaintiff disputed the MACY'S ACCOUNT.

COUNT FORTY-THREE
TARGET CORP., TARGET AND TD BANK

446. On numerous occasions between July of 2015 and the present, the Plaintiff notified EXPERIAN, TRANS UNION and EQUIFAX, that he continued to deny ownership of, use of, or any responsibility for paying, the TARGET ACCOUNT, and demanded that reporting of the TARGET ACCOUNT be terminated immediately and permanently.

447. In addition to reporting his continued dispute of the TARGET ACCOUNT to TRANS UNION, EXPERIAN and/or EQUIFAX, the Plaintiff also delivered notice of

-111-

his continued dispute of the TARGET ACCOUNT directly to TARGET in the form of, inter alia, (1) communication between the Plaintiff and TARGET and (2) service upon TARGET'S Registered Agent, of a Notice of Intent to Sue and a copy of a lawsuit which was filed in the United States District Court, for the Southern District of California, styled as Michael P. Tatro v. Sterling Jewelers, Inc. et al, Case Number: 3:17-1305-JAH (see, paragraphs 235-236, supra), in which lawsuit TARGET entered an appearance, through counsel, and has prosecuted a motion to dismiss on venue and jurisdiction grounds.

448. TARGET knowingly and willfully failed or otherwise refused to report the TARGET ACCOUNT to TRANS UNION, EXPERIAN and/or EQUIFAX as disputed by the Plaintiff.

449. TARGET's knowing and willful failure and/or refusal to report the TARGET ACCOUNT to TRANS UNION, EXPERIAN and/or EQUIFAX as disputed by the Plaintiff violated, and continues to violate, TARGET lawful duty and responsibility to report "incomplete or inaccurate" information under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(1)(C)&(D).

450. The Plaintiff's dispute of the TARGET ACCOUNT is bona fide in that he did not open, or authorize the opening of, the TARGET ACCOUNT, and therefore TARGET had no discretion to withhold notification to TRANS UNION, EXPERIAN, and/or EQUIFAX that the Plaintiff disputed the TARGET ACCOUNT.

**********

-112-

FOURTH CAUSE OF ACTION
FALSE REPRESENTATIONS TO OBTAIN INFORMATION
(15 U.S.C. § 1691e(10) and R.I.G.L. § 19-14.9-7(j))

451.  The Plaintiff restates and realleges the contents of the above-numbered paragraphs with full force and effect, as though fully set forth here.

[A]
FEDERAL AND STATE DEBT COLLECTION STATUTES

(1)
RHODE ISLAND FAIR DEBT COLLECTION PRACTICES ACT
(R.I.G.L. § 19-14.9-7 = False or Misleading Representations)

"A debt collector may not use any false, deceptive or misleading representations or means in connection with the collection of any debt. Such false or misleading means shall include, but not be limited to:

(j) The use of any false representations or deceptive means to collect, or attempt to collect any debt, or to obtain information concerning a consumer.

(2)
FAIR DEBT COLLECTION PRACTICES ACT
(15 U.S.C. § 1692e(10) = False or Misleading Representations)

"A debt collector may not use any false, deceptive, or misleading representations or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section"

"(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

(3)
GENERAL STATEMENTS AS TO DEBT COLLECTOR DEFENDANTS

452.  A debt collector's conduct in certifying to a consumer reporting agency that is has a permissible purpose to obtain a credit report when the debt collector knows, should know, or consciously avoided knowing:

-113-

(a) that they are only permitted to obtain a credit report about a consumer if the consumer was involved in the transaction which created the debt they are (i) attempting to collect, or (ii) evaluating for purchase as an investment;

(b) that no employee of the debt collector ever possessed, reviewed, or otherwise examined any of the underlying documents which established the debt or the consumer's purported liability to pay the debt;

constitutes a false representation or deceptive means to collect or attempt to collect a debt or to obtain information about a consumer.

453.  If a debt collector never possesses, reviews or otherwise examines any of the underlying documents which established the subject debt or a consumer's purported liability to pay that debt, and instead the debt collector relies solely upon blanket and generic assurances conveyed by an assignor, then the debt collector is NEVER positioned to provide a valid, fact-based certification of a permissible purpose to a consumer reporting agency in order to obtain a credit report about a consumer, especially when the account they are attempting to collect (or which they maybe contemplating purchasing as an investment) was opened and utilized by an identity thief.

[B]
TATE & KIRLAN ASSOCIATES, INC.
COUNT FORTY-FIVE

454.  TATE knowingly and willfully obtained information about the Plaintiff from TRANS UNION (on the dates alleged, supra), by furnishing a certification as to their authority and permissible purpose, which TATE knew, should have known, or consciously avoided knowing was inherently false and deceptive insofar as the Plaintiff was not involved in the opening and/or use of the subject delinquent

-114-

account (which TATE has still failed and/or refused to identity to the Plaintiff), and TATE made no effort to confirm the Plaintiff's involvement (or lack thereof) in the opening of the unidentified account, beyond blindly accepting blanket and generic assurances provide by the original creditor and/or assignor of the unidentified collection account.

[C]
DEBTSY, INC.
COUNT FORTY-SIX

455.  DEBTSY knowingly and willfully obtained information about the Plaintiff from EXPERIAN (on the dates alleged, supra), by furnishing a certification as to their authority and permissible purpose, which DEBTSY knew, should have known, or consciously avoided knowing was inherently false and deceptive insofar as the Plaintiff was not involved in the opening and/or use of the subject delinquent account (which DEBTSY has still failed and/or refused to identity to the Plaintiff), and DEBTSY made no effort to confirm the Plaintiff's involvement (or lack thereof) in the opening of the unidentified account, beyond blindly accepting blanket and generic assurances provide by the original creditor and/or assignor of the unidentified collection account.

[D]
AFNI, INC.
COUNT FORTY-SEVEN

456.  AFNI knowingly and willfully obtained information about the Plaintiff from TRANS UNION (on the dates alleged, supra), by furnishing a certification as to their authority and permissible purpose, which AFNI knew, should have known, or consciously avoided knowing was inherently false and deceptive insofar as the Plaintiff was not involved in the opening and/or use of the subject delinquent account (which AFNI has still failed and/or refused to identity to the Plaintiff), and AFNI made no effort to confirm the Plaintiff's involvement (or

-115-

lack thereof) in the opening of the unidentified account, beyond blindly accepting blanket and generic assurances provide by the original creditor and/or assignor of the unidentified collection account.

**********

-116-

FIFTH CAUSE OF ACTION
FAILURE TO VALIDATE DEBTS
(R.I.G.L. § 19-14.9-9)
(15 U.S.C. § 19692g(a))

457. The Plaintiff restates and realleges the contents of the above-numbered paragraphs with full force and effect, as though fully set forth here.

[A]
FEDERAL AND STATE DEBT COLLECTION STATUTES
VALIDATION OF DEBTS
(R.I.G.L. § 19-14.9-9)
(15 U.S.C. 1692g(a))

"Within five (5) days of the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following is contained in the initial communication, or the consumer has paid the debt, send the consumer written notice concerning:

(a) The amount of the debt;

(b) The name of the creditor to whom the debt is owed;

(c) A statement that unless the consumer, within thirty (30) days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(d) A statement that if the consumer notifies the debt collector in writing, within the thirty (30) day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(e) A statement that, upon the consumer's request within the thirty (30) day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

(2) If the consumer notifies the debt collector in writing, within the thirty (30) day period described in subsection (1)(d) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and

-117-

address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portions thereof, until the debtor obtains verification of the debt or a copy of the judgment, or the name and address of the original creditor, is mailed to the consumer by the debt collector.

(3) The failure of the consumer to dispute the validity of a debt under this section shall not be construed by any court as an admission of liability.

[B]
TATE & KILRLAN & ASSOCIATES, INC.

COUNT FORTY-EIGHT

458. For the purposes of the RI-FDCPA and the FDCPA, TATE'S acquisition of the Plaintiff's credit report on the date alleged, supra, constitutes TATE'S "initial communication" with the Plaintiff.

459. TATE knowingly and willfully failed to provide the Plaintiff with the amount of the debt, the name of the creditor to whom the alleged debt is owed, or any of the statements required by subsections R.I.G.L. § 19-14.9-9(1)(c), (d) or (e); or 15 U.S.C. § 1692g (a)(3), (4)-(5).

COUNT FORTY-NINE

460. TATE knowingly and willfully failed to validate the allege debt it was attempting to collect, upon the Plaintiff's written request, including but not limited to the knowing and willful failure to provide the name and address of the original creditor and the amount of the debt, in violation of R.I.G.L. § 19-14.9-9(2), and 15 U.S.C. § 1692(b).

[C]
DEBTSY, INC

COUNT FIFTY

461. For the purposes of the RI-FDCPA and the FDCPA, DEBTSY'S acquisition of the Plaintiff's credit report on the date alleged, supra, constitutes

-118-

DEBTSY'S "initial communication" with the Plaintiff.

462. DEBTSY knowingly and willfully failed to provide the Plaintiff with the amount of the debt, the name of the creditor to whom the alleged debt is owed, or any of the statements required by subsections R.I.G.L. § 19-14.9-9(1)(c), (d) or (e); or 15 U.S.C. § 1692g (a)(3), (4)-(5).

COUNT FIFTY-ONE

463. DEBTSY knowingly and willfully failed to validate the allege debt it was attempting to collect, upon the Plaintiff's written request, including but not limited to the knowing and willful failure to provide the name and address of the original creditor and the amount of the debt, in violation of R.I.G.L. § 19-14.9-9(2), and 15 U.S.C. § 1692(b).

[D]
AFNI, INC.

COUNT FIFTY-TWO

464. For the purposes of the RI-FDCPA and the FDCPA, AFNI'S acquisition of the Plaintiff's credit report on the date alleged, supra, constitutes AFNI'S "initial communication" with the Plaintiff.

465. AFNI knowingly and willfully failed to provide the Plaintiff with the amount of the debt, the name of the creditor to whom the alleged debt is owed, or any of the statements required by subsections R.I.G.L. § 19-14.9-9(1)(c), (d) or (e); or 15 U.S.C. § 1692g (a)(3), (4)-(5).

COUNT FIFTY-THREE

466. AFNI knowingly and willfully failed to validate the allege debt it was attempting to collect, upon the Plaintiff's written request, including but not limited to the knowing and willful failure to provide the name and address of the original creditor and the amount of the debt, in violation of R.I.G.L. § 19-14.9-9(2), and 15 U.S.C. § 1692(b).

**********

-119-

SIXTH CAUSE OF ACTION
DECLARATORY JUDGEMENT
(R.I.G.L. § 9-30-1, et. seq.)

467. The Plaintiff restates and realleges the contents of the above-numbered paragraphs with full force and effect, as though fully set forth here.

[A]
RHODE ISLAND UNIFORM DECLARATORY JUDGMENT ACT
(R.I.G.L. §§ 9-30-1, et. seq.)

"The superior or family court, upon petition, following such procedure as the court by general or special rules prescribe, shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree."

[B]
SUPER. R. CIV. P. RULE 57

"Declaratory Judgments -- The Procedure for obtaining a declaratory judgement authorized by statute shall be in accordance with these rules, and the right to a trial by jury may be demanded under the circumstances and in the manner provided in Rules 38 and 39. The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate. The court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar."

[C]
DISCOVER FINANCIAL SERVICES, LLC
COUNT FIFTY-FOUR

468. Pursuant to the Rhode Island Uniform Declaratory Judgment Act, R.I.G.L. § 9-30-1, and for the purposes of the Plaintiff's allegations (as set forth in the Complaint) against DISCOVER, regarding (A) the opening of the DISCOVER ACCOUNT by the imposter; (B) DISCOVER'S reporting and re-reporting of

-120-

the DISCOVER ACCOUNT to consumer reporting agencies; (C) DISCOVER'S inadequate investigation of the Plaintiff's disputes of the DISCOVER ACCOUNT; (D) DISCOVER'S failure or refusal to report the DISCOVER ACCOUNT to consumer reporting agencies as being disputed by the Plaintiff; (E) DISCOVER'S failure to maintain and/or enforce internal policies and procedures to insure compliance with the Fair Credit Reporting Act, (F) DISCOVER'S failure to maintain and/or enforce internal policies and procedures to detect and prevent identity theft, and (G) any and all other claims raised herein, or which may be raised (by amendment of the Complaint) at a later date, the Plaintiff seeks a judgment declaring:

a. That the Plaintiff is a person, as defined by 15 U.S.C. § 1681a(b);

b. That the Plaintiff is a consumer, as defined by 15 U.S.C. § 1681a(c);

c. That the Plaintiff's name, date of birth and social security number as received, possessed, transferred and/or used by DISCOVER, in relation to the DISCOVER ACCOUNT, constitute all or part of the Plaintiff's "means of identification" as defined by R.I.G.L. § 11-49.1-2(3)(i); and are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

d. That the Plaintiff's "consumer credit reports" as (i) defined by 15 U.S.C. § 1681a(d)(1), and (ii) requested, obtained and possessed by DISCOVER, in connection with the DISCOVER ACCOUNT, are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

e. That the Plaintiff was in the custody of the Federal Bureau of Prisons when the DISCOVER ACCOUNT was opened.

f. That DISCOVER'S willfully obtaining and/or possessing the Plaintiff's credit report(s) as alleged in paragraphs 102 and 376-377 of the Complaint constitutes a "violation of a federal, state or local law", for the purposes of Rhode Island's Identity Fraud Statute, R.I.G.L. § 11-49.1-3(a)(7), and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

g. That DISCOVER unlawfully transferred the Plaintiff's means of identification to one or more third-party, including, but not limited to, TRANS UNION, EXPERIAN and/or EQUIFAX on numerous occasions, from February of 2013 to the present, for the purposes of requesting credit reports about the Plaintiff and reporting the DISCOVER ACCOUNT against the Plaintiff, without ever having a lawful purpose to have obtained, possessed or transferred that

—121—

information, and without taking any steps to verify that the Plaintiff's assertions that (i) he was incarcerated when the DISCOVER ACCOUNT was opened, and (ii) he was the victim of identity theft.

h. That the unlawful transfer of the Plaintiff's "means of identification" constitutes a criminal offense under R.I.G.L. § 11-49.1-3, and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

[D]
MACY'S RETAIL HOLDINGS, INC. AND FDS BANK, FSB
COUNT FIFTY-FIVE

469. Pursuant to the Rhode Island Uniform Declaratory Judgment Act, R.I.G.L § 9-30-1, and for the purposes of the Plaintiff's allegations (as set forth in the Complaint) against MACY'S, regarding (A) the opening of the MACY'S ACCOUNT by the imposter; (B) MACY'S reporting and re-reporting of the MACY'S ACCOUNT to consumer reporting agencies; (C) MACY'S's inadequate investigation of the Plaintiff's disputes of the MACY'S ACCOUNT; (D) MACY'S failure and/or refusal to report the MACY'S ACCOUNT to consumer reporting agencies as being disputed by the Plaintiff; (E) MACY'S failure to maintain and/or enforce internal policies and procedures to insure compliance with the Fair Credit Reporting Act, (F) MACY'S failure to maintain and/or enforce internal policies and procedures to detect and prevent identity theft, and (G) any and all other claims raised herein, or which may be raised (by amendment of the Complaint) at a later date, the Plaintiff seeks a judgment declaring:

a. That the Plaintiff is a person, as defined by 15 U.S.C. § 1681a(b);

b. That the Plaintiff is a consumer, as defined by 15 U.S.C. § 1681a(c);

c. That the Plaintiff's name, date of birth and social security number as received, possessed, transferred and/or used by MACY'S, in relation to the MACY'S ACCOUNT, constitute all or part of the Plaintiff's "means of identification" as defined by R.I.G.L. § 11-49.1-2(3)(i); and are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

d. That the Plaintiff's "consumer credit reports" as (i) defined by 15 U.S.C. § 1681a(d)(1), and (ii) requested, obtained and possessed by MACY'S, in connection with the MACY'S ACCOUNT, are entitled to be,

—122—

or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

e. That the Plaintiff was in the custody of the Federal Bureau of Prisons when the MACY'S ACCOUNT was opened.

f. That MACY'S willfully obtaining and/or possessing the Plaintiff's credit report(s) as alleged in paragraph 158 of the Complaint constitutes a "violation of a federal, state or local law", for the purposes of Rhode Island's Identity Fraud Statute, R.I.G.L. § 11-49.1-3(a)(7), and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

g. That MACY'S unlawfully transferred the Plaintiff's means of identification to one or more third-party, including, but not limited to, TRANS UNION, EXPERIAN and/or EQUIFAX on numerous occasions, from February of 2013 to the present, for the purposes of requesting credit reports about the Plaintiff and reporting the MACY'S ACCOUNT against the Plaintiff, without ever having a lawful purpose to have obtained, possessed or transferred that information, and without taking any steps to verify that the Plaintiff's assertions that (i) he was incarcerated when the MACY'S ACCOUNT was opened, and (ii) he was the victim of identity theft.

h. That the unlawful transfer of the Plaintiff's "means of identification" constitutes a criminal offense under R.I.G.L. § 11-49.1-3, and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

[E]
TARGET CORP, TARGET AND TD BANK
COUNT FIFTY-SIX

470. Pursuant to the Rhode Island Uniform Declaratory Judgment Act, R.I.G.L § 9-30-1, and for the purposes of the Plaintiff's allegations (as set forth in the Complaint) against TARGET, regarding (A) the opening of the TARGET ACCOUNT by the imposter; (B) TARGET reporting and re-reporting of the TARGET ACCOUNT to consumer reporting agencies; (C) TARGET's inadequate investigation of the Plaintiff's disputes of the TARGET ACCOUNT; (D) TARGET failure and/or refusal to report the TARGET ACCOUNT to consumer reporting agencies as being disputed by the Plaintiff; (E) TARGET failure to maintain and/or enforce internal policies and procedures to insure compliance with the Fair Credit Reporting Act, (F) TARGET failure to maintain and/or enforce internal policies and procedures to detect and prevent identity theft, and (G) any and all other

—123—

claims raised herein, or which may be raised (by amendment of the Complaint) at a later date, the Plaintiff seeks a judgment declaring:

a. That the Plaintiff is a person, as defined by 15 U.S.C. § 1681a(b);

b. That the Plaintiff is a consumer, as defined by 15 U.S.C. § 1681a(c);

c. That the Plaintiff's name, date of birth and social security number as received, possessed, transferred and/or used by TARGET, in relation to the TARGET ACCOUNT, constitute all or part of the Plaintiff's "means of identification" as defined by R.I.G.L. § 11-49.1-2(3)(i); and are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

d. That the Plaintiff's "consumer credit reports" as (i) defined by 15 U.S.C. § 1681a(d)(1), and (ii) requested, obtained and possessed by TARGET, in connection with the TARGET ACCOUNT, are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

e. That the Plaintiff was in the custody of the Federal Bureau of Prisons when the TARGET ACCOUNT was opened.

f. That TARGET willfully obtaining and/or possessing the Plaintiff's credit report(s) as alleged in paragraph 225 of the Complaint constitutes a "violation of a federal, state or local law", for the purposes of Rhode Island's Identity Fraud Statute, R.I.G.L. § 11-49.1-3(a)(7), and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

g. That TARGET unlawfully transferred the Plaintiff's means of identification to one or more third-party, including, but not limited to, TRANS UNION, EXPERIAN and/or EQUIFAX on numerous occasions, from February of 2013 to the present, for the purposes of requesting credit reports about the Plaintiff and reporting the TARGET ACCOUNT against the Plaintiff, without ever having a lawful purpose to have obtained, possessed or transferred that information, and without taking any steps to verify that the Plaintiff's assertions that (i) he was incarcerated when the TARGET ACCOUNT was opened, and (ii) he was the victim of identity theft.

h. That the unlawful transfer of the Plaintiff's "means of identification" constitutes a criminal offense under R.I.G.L. § 11-49.1-3, and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

[F]
BARCLAYS BANK DELAWARE
COUNT FIFTY-SEVEN

471. Pursuant to the Rhode Island Uniform Declaratory Judgment Act, R.I.G.L § 9-30-1, and for the purposes of the Plaintiff's allegations (as set

—124—

forth in the Complaint) against BARCLAYS, regarding (A) the opening of the BARCLAYS ACCOUNT by the imposter; (B) BARCLAYS' reporting and re-reporting of the BARCLAYS ACCOUNT to consumer reporting agencies; (C) BARCLAYS' inadequate investigation of the Plaintiff's disputes of the BARCLAYS ACCOUNT; (D) BARCLAYS' failure and/or refusal to report the BARCLAYS ACCOUNT to consumer reporting agencies as being disputed by the Plaintiff; (E) BARCLAYS' failure to maintain and/or enforce internal policies and procedures to insure compliance with the Fair Credit Reporting Act, (F) BARCLAYS' failure to maintain and/or enforce internal policies and procedures to detect and prevent identity theft, and (G) any and all other claims raised herein, or which may be raised by amendment of the Complaint) at a later date, the Plaintiff seeks a judgment declaring:

    a. That the Plaintiff is a person, as defined by 15 U.S.C. § 1681a(b);

    b. That the Plaintiff is a consumer, as defined by 15 U.S.C. § 1681a(c);

    c. That the Plaintiff's name, date of birth and social security number as received, possessed, transferred and/or used by BARCLAYS, in relation to the BARCLAYS ACCOUNT, constitute all or part of the Plaintiff's "means of identification" as defined by R.I.G.L. § 11-49.1-2(3)(i); and are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

    d. That the Plaintiff's "consumer credit reports" as (i) defined by 15 U.S.C. § 1681a(d)(1), and (ii) requested, obtained and possessed by BARCLAYS, in connection with the BARCLAYS ACCOUNT, are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

    e. That the Plaintiff was in the custody of the Federal Bureau of Prisons when the BARCLAYS ACCOUNT was opened.

    f. That BARCLAYS' willfully obtaining and/or possessing the Plaintiff's credit report(s) as alleged in paragraphs 272 and 404-405 of the Complaint constitutes a "violation of a federal, state or local law", for the purposes of Rhode Island's Identity Fraud Statute, R.I.G.L. § 11-49.1-3(a)(7), and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

    g. That BARCLAYS' unlawfully transferred the Plaintiff's means of identification to one or more third-party, including, but not limited to, TRANS UNION, EXPERIAN and/or EQUIFAX on numerous occasions, from February of 2013 to the present, for the purposes of requesting credit reports about the Plaintiff and reporting the

---

BARCLAYS ACCOUNT against the Plaintiff, without ever having a lawful purpose to have obtained, possessed or transferred that information, and without taking any steps to verify that the Plaintiff's assertions that (i) he was incarcerated when the BARCLAYS ACCOUNT was opened, and (ii) he was the victim of identity theft.

    h. That the unlawful transfer of the Plaintiff's "means of identification"1 constitutes a criminal offense under R.I.G.L. § 11-49.1-3. and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

[G]
TATE & KILRLAN ASSOCIATES, INC.
COUNT FIFTY-EIGHT

    472. Pursuant to the Rhode Island Uniform Declaratory Judgment Act, R.I.G.L § 9-30-1, and for the purposes of the Plaintiff's allegations (as set forth in the Complaint) against TATE, regarding (A) the opening (by the IMPOSTER) of whatever original credit report TATE attempted to collect from the Plaintiff; (B) TATE'S inadequate investigation of the Plaintiff's disputes of the collection account TATE has refused to identity and/or TATE's willful failure to validate the account upon the Plaintiff's written request, and/or within five days of obtaining the Plaintiff's credit report; (C) TATE'S failure to maintain and/or enforce internal policies and procedures to insure compliance with the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and the Rhode Island Fair Debt Collection Practices Act, (D) any and all other claims raised herein, or which may be raised (by amendment of the Complaint) at a later date, the Plaintiff seeks a judgment declaring:

    a. That the Plaintiff is a person, as defined by 15 U.S.C. § 1681a(b);

    b. That the Plaintiff is a consumer, as defined by 15 U.S.C. § 1681a(c);

    c. That the Plaintiff's name, date of birth and social security number as received, possessed, transferred and/or used by TATE, constitute all or part of the Plaintiff's "means of identification" as defined by R.I.G.L. § 11-49.1-2(3)(i); and are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

    d. That the Plaintiff's "consumer credit reports" as (i) defined by 15 U.S.C. § 1681a(d)(1), and, (ii) requested, obtained and possessed by

---

TATE, are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

    e. That the Plaintiff was in the custody of the Federal Bureau of Prisons when whatever account TATE attempted to collect from the Plaintiff was opened by the IMPOSTER with the original creditor.

    f. That TATE willfully obtaining and/or possessing the Plaintiff's credit report(s) as alleged in paragraph 299 of the Complaint constitutes a "violation of a federal, state or local law", for the purposes of Rhode Island's Identity Fraud Statute, R.I.G.L. § 11-49.1-3(a)(7), and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

    g. That TATE unlawfully transferred the Plaintiff's means of identification to one or more third-party, including, but not limited to, TRANS UNION, EXPERIAN and/or EQUIFAX, for the purposes of requesting credit reports about the Plaintiff, when TATE knew, should have known or consciously avoided knowing that no permissible purpose existed to obtain those credit reports, insofar as TATE never took and steps to verify the Plaintiff's assertions that (i) he was incarcerated when the whatever account TATE was attempting to collect was opened, and (ii) he was the victim of identity theft.

    h. That the unlawful transfer of the Plaintiff's "means of identification"1 constitutes a criminal offense under R.I.G.L. § 11-49.1-3. and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

    i. Pursuant to the RI-FDCPA (19-14.9-9) and the FDCPA (15 U.S.C. § 1692(g), TATE was required, upon the Plaintiff's written request, to validate whatever debt it was attempting to collect when it obtained the Plaintiff's credit report as alleged in paragraph 299 of the Complaint, insofar as the Plaintiff learned of the alleged debt not through a direct communication from TATE, but by learning of the credit report inquiry made by TATE.

    j. TATE'S acquisition of the Plaintiff's Consumer Report as alleged in paragraph 299 of the Complaint, constitutes an "initial communication" for the purposes of triggering TATE'S legal duty to validate whatever debt it was attempting to collect from the Plaintiff, where the Plaintiff's discovery of TATE'S credit inquiry is the sole manner in which the Plaintiff learned of TATE's attempt to collect a debt from him.

[H]
DEBTSY, INC.
COUNT FIFTY-NINE

    473. Pursuant to the Rhode Island Uniform Declaratory Judgment Act,

---

R.I.G.L § 9-30-1, and for the purposes of the Plaintiff's allegations (as set forth in the Complaint) against DEBTSY, regarding (A) the opening (by the IMPOSTER) of whatever original credit account DEBTSY attempted to collect from the Plaintiff; (B) DEBTSY'S inadequate investigation of the Plaintiff's disputes of the collection account DEBTSY has refused to identity and/or DEBTSY'S willful failure to validate the account upon the Plaintiff's written request, and/or within five days of obtaining the Plaintiff's credit report; (C) DEBTSY'S failure to maintain and/or enforce internal policies and procedures to insure compliance with the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and the Rhode Island Fair Debt Collection Practices Act, (D) any and all other claims raised herein, or which may be raised (by amendment of the Complaint) at a later date, the Plaintiff seeks a judgment declaring:

    a. That the Plaintiff is a person, as defined by 15 U.S.C. § 1681a(b);

    b. That the Plaintiff is a consumer, as defined by 15 U.S.C. § 1681a(c);

    c. That the Plaintiff's name, date of birth and social security number as received, possessed, transferred and/or used by DEBTSY, constitute all or part of the Plaintiff's "means of identification" as defined by R.I.G.L. § 11-49.1-2(3)(i); and are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

    d. That the Plaintiff's "consumer credit reports" as (i) defined by 15 U.S.C. § 1681a(d)(1), and, (ii) requested, obtained and possessed by DEBTSY, are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

    e. That the Plaintiff was in the custody of the Federal Bureau of Prisons when whatever account DEBTSY attempted to collect from the Plaintiff was opened by the IMPOSTER with the original creditor.

    f. That DEBTSY willfully obtaining and/or possessing the Plaintiff's credit report(s) as alleged in paragraph 329 of the Complaint constitutes a "violation of a federal, state or local law", for the purposes of Rhode Island's Identity Fraud Statute, R.I.G.L. § 11-49.1-3(a)(7), and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

    g. That DEBTSY unlawfully transferred the Plaintiff's means of identification to one or more third-party, including, but not limited to, TRANS UNION, EXPERIAN and/or EQUIFAX, for the purposes

of requesting credit reports about the Plaintiff, when DEBTSY knew, should have known or consciously avoided knowing that no permissible purpose existed to obtain those credit reports, insofar as DEBTSY never took and steps to verify the Plaintiff's assertions that (i) he was incarcerated when the whatever account DEBTSY was attempting to collect was opened, and (ii) he was the victim of identity theft.

h. That the unlawful transfer of the Plaintiff's "means of identification"1 constitutes a criminal offense under R.I.G.L. § 11-49.1-3. and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

i. Pursuant to the RI-FDCPA (19-14.9-9) and the FDCPA (15 U.S.C. § 1692g), DEBTSY was required, upon the Plaintiff's written request, to validate whatever debt it was attempting to collect when it obtained the Plaintiff's credit report as alleged in paragraph 299 of the Complaint, insofar as the Plaintiff learned of the alleged debt not through a direct communication from DEBTSY, but by learning of the credit report inquiry made by DEBTSY.

j. DEBTSY'S acquisition of the Plaintiff's Consumer Report as alleged in paragraph 299 of the Complaint, constitutes an "initial communication" for the purposes of triggering DEBTSY'S legal duty to validate whatever debt it was attempting to collect from the Plaintiff, where the Plaintiff's discovery of DEBTSY'S credit inquiry is the sole manner in which the Plaintiff learned of DEBTSY's attempt to collect a debt from him.

[I]
AFNI, INC.
COUNT SIXTY

474. Pursuant to the Rhode Island Uniform Declaratory Judgment Act, R.I.G.L § 9-30-1, and for the purposes of the Plaintiff's allegations (as set forth in the Complaint) against AFNI, regarding (A) the opening (by the IMPOSTER) of whatever original credit account AFNI attempted to collect from the Plaintiff; (B) AFNI's inadequate investigation of the Plaintiff's disputes of the collection account AFNI has refused to identify and/or AFNI's willful failure to validate the account upon the Plaintiff's written request, and/or within five days of obtaining the Plaintiff's credit report; (C) AFNI's failure to maintain and/or enforce internal policies and procedures to insure compliance with the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, and

-129-

---

the Rhode Island Fair Debt Collection Practices Act, (D) any and all other claims raised herein, or which may be raised (by amendment of the Complaint) at a later date, the Plaintiff seeks a judgment declaring:

a. That the Plaintiff is a person, as defined by 15 U.S.C. § 1681a(b);

b. That the Plaintiff is a consumer, as defined by 15 U.S.C. § 1681a(c);

c. That the Plaintiff's name, date of birth and social security number as received, possessed, transferred and/or used by AFNI, constitute all or part of the Plaintiff's "means of identification" as defined by R.I.C.L. § 11-49.1-2(3)(1); and are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

d. That the Plaintiff's "consumer credit reports" as (i) defined by 15 U.S.C. § 1681a(d)(1), and (ii) requested, obtained and possessed by AFNI, are entitled to be, or expected to be private, within the meaning of R.I.G.L. § 9-1-28.1.

e. That the Plaintiff was in the custody of the Federal Bureau of Prisons when whatever account AFNI attempted to collect from the Plaintiff was opened by the IMPOSTER with the original creditor.

f. That AFNI willfully obtaining and/or possessing the Plaintiff's credit report(s) as alleged in paragraph 359 of the Complaint constitutes a "violation of a federal, state or local law", for the purposes of Rhode Island's Identity Fraud Statute, R.I.G.L. § 11-49.1-3(a)(7), and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

g. That AFNI unlawfully transferred the Plaintiff's means of identification to one or more third-party, including, but not limited to, TRANS UNION, EXPERIAN and/or EQUIFAX, for the purposes of requesting credit reports about the Plaintiff, when AFNI knew, should have known or consciously avoided knowing that no permissible purpose existed to obtain those credit reports, insofar as AFNI never took and steps to verify the Plaintiff's assertions that (i) he was incarcerated when the whatever account AFNI was attempting to collect was opened, and (ii) he was the victim of identity theft.

h. That the unlawful transfer of the Plaintiff's "means of identification"1 constitutes a criminal offense under R.I.G.L. § 11-49.1-3. and, as such, the Plaintiff may seek damages under R.I.G.L. § 9-1-2.

i. Pursuant to the RI-FDCPA (19-14.9-9) and the FDCPA (15 U.S.C. § 1692g), AFNI was required, upon the Plaintiff's written request, to validate whatever debt it was attempting to collect when it obtained the Plaintiff's credit report as alleged in paragraph 299 of the Complaint, insofar as the Plaintiff learned of the alleged debt not through a direct communication from AFNI, but by learning

-130-

---

of the credit report inquiry made by AFNI.

j. AFNI'S acquisition of the Plaintiff's Consumer Report as alleged in paragraph 299 of the Complaint, constitutes an "initial communication" for the purposes of triggering AFNI'S legal duty to validate whatever debt it was attempting to collect from the Plaintiff, where the Plaintiff's discovery of AFNI'S credit inquiry is the sole manner in which the Plaintiff learned of AFNI's attempt to collect a debt from him.

-131-

---

RELIEF SOUGHT

WHEREFORE, the Plaintiff prays this Honorable Court enter judgment for the Plaintiff, and against the defendants, in the following manner:

[A]
MONETARY DAMAGES

(1)
FAIR CREDIT REPORTING ACT

OBTAINING CREDIT REPORTS WITHOUT A PERMISSIBLE PURPOSE
(15 U.S.C. §§ 1681b, 1681n, and 1681o)

1. For knowingly and willfully obtaining the Plaintiff's credit report(s) without a permissible purpose, and/or for knowingly and willfully obtaining the Plaintiff's credit reports under circumstances which constitute fraud or false pretenses, in violation of the Fair Credit Reporting Act, monetary damages as follows:

A. As to DISCOVER, as alleged in Counts 1 through 26, statutory damages of $1,000.00 per incident, for a total of $26,000.00; as well as actual and punitive damages in an amount allowed by the court.

B. As to BARCLAYS, as alleged in counts 27 through 34, statutory damages of $1,000.00 per incident, for a total of $8,000.00; as well as actual and punitive damages in an amount allowed by the court.

C. As to TATE, as alleged in Count 35, statutory damages of $1,000.00; as well as actual and punitive damages in an amount allowed by the court.

D. As to DEBTSY, as alleged in Count 36, statutory damages of $1,000.00; as well as actual and punitive damages in an amount allowed by the court.

-132-

E. As to AFNI, as alleged in Count 37, statutory damages of $1,000.00; as well as actual and punitive damages in an amount allowed by the court.

### (ii)
### FAILURE TO CONDUCT REASONABLE INVESTIGATIONS OF DISPUTES RECEIVED DIRECTLY FROM CONSUMER REPORTING AGENCIES
### (15 U.S.C. § 1681s-(b))

2. Actual, statutory and punitive damages to the extent and in the amount authorized by the Fair Credit Reporting Act, for knowingly and willfully failing and/or refusing to conduct reasonable investigations of the disputes (a) filed by the Plaintiff directly with EXPERIAN, TRANS UNION and EQUIFAX, and (b) as forwarded to the defendants, by EXPERIAN, TRANS UNION and/or EQUIFAX, as to DISCOVER (Count 38), MACY'S (Count 39), TARGET (Count 40) and BARCLAYS (Count 41).

### (iii)
### FAILURE TO REPORT ACCOUNT AS DISPUTED
### (15 U.S.C. § 1681s-2(A)(3)).

3. Actual, statutory and punitive damages to the extent, and in the amount, authorized by the Fair Credit Reporting Act, for knowingly and willfully failing to report the Plaintiff's dispute to EXPERIAN, TRANS UNION and/or EQUIFAX, as to DISCOVER (Count 42), MACY'S (Count 43), and TARGET (Count 44).

### [B]
### RHODE ISLAND FAIR DEBT COLLECTION PRACTICES ACT
### FEDERAL FAIR DEBT COLLECTION PRACTICES ACT
### (R.I.G.L. § 19-14.9-13(2)(a))
### (15 U.S.C. § 1692k(a)(1) and (2))

### (i)
### FAILURE TO VALIDATE DEBTS

4. Actual, statutory, and punitive damages as allowed by the Rhode Island Fair Debt Collection Practices Act, and the Federal Fair Debt Collection Practices Act, to the extent that those monetary damages do not overlap, and, in any instance in which such damages do overlap, the Plaintiff demands the greater

-133-

thereof, for failure to validate debts upon (1) initial communication with the Plaintiff, and (ii) upon written notification from the Plaintiff, as to TATE (Counts 48 and 49), DEBTSY (Counts 50 and 51), and AFNI (Counts 52 and 53).

### (ii)
### FALSE REPRESENTATIONS TO OBTAIN INFORMATION

5. Actual, statutory and punitive damages as allowed by the Rhode Island Fair Debt Collection Practices Act and the Federal Fair Debt Collection Practices Act, for the knowing and willful making of false representations to EXPERIAN, TRANS UNION and/or EQUIFAX, in order to obtain the Plaintiff's credit reports.

### [C]
### INJUNCTIVE RELIEF
### RULE 65 OF THE RHODE ISLAND RULES OF CIVIL PROCEDURE

6. Pursuant to Rule 65 (a)(2)of the Rhode Island Superior Court Rules of Civil Procedure, injunctive relief against the defendant as follows:

A. An order instructing the each defendant to:

1. Compile a list of any and all information about the Plaintiff currently contained with the defendants' internal files, and publish that list to the Plaintiff;

2. Compile a complete listing of the time and date on which any information about the Plaintiff was transferred by the defendants' to any third-party, including a description of the specific information transferred.

3. After completing subsection A(1) and (2), purge, and forever delete any and all information about the Plaintiff from their internal files.

B. An order directing DISCOVER to immediately file the necessary documentation and notifications with EXPERIAN, TRANS UNION, EQUIFAX and/or any other consumer reporting agency to which DISCOVER is currently, or previously has reported the DISCOVER ACCOUNT about the PLAINTIFF, to immediately and forever delete the DISCOVER ACCOUNT from the Plaintiff's credit report, and to further inform those consumer reporting agencies that the DISCOVER ACCOUNT never belonged to the Plaintiff and was opened and/or used as a result of identity theft.

C. An order directing MACY'S to immediately file the necessary documentation and notifications with EXPERIAN, TRANS UNION, EQUIFAX and/or any other consumer reporting agency to which MACY'S is currently, or previously has reported the MACY'S ACCOUNT about the PLAINTIFF, to

-134-

immediately and forever delete the MACY'S ACCOUNT from the Plaintiff's credit report, and to further inform those consumer reporting agencies that the MACY'S ACCOUNT never belonged to the Plaintiff and was opened and/or used as a result of identity theft.

D. An order directing TARGET to immediately file the necessary documentation and notifications with EXPERIAN, TRANS UNION, EQUIFAX and/or any other consumer reporting agency to which TARGET is currently, or previously has reported the TARGET ACCOUNT about the PLAINTIFF, to immediately and forever delete the TARGET ACCOUNT from the Plaintiff's credit report, and to further inform those consumer reporting agencies that the TARGET ACCOUNT never belonged to the Plaintiff and was opened and/or used as a result of identity theft.

E. An order directing BARCLAYS to immediately file the necessary documentation and notifications with EXPERIAN, TRANS UNION, EQUIFAX and/or any other consumer reporting agency to which BARCLAYS is currently, or previously has reported the BARCLAYS ACCOUNT about the PLAINTIFF, to immediately and forever delete the BARCLAYS ACCOUNT from the Plaintiff's credit report, and to further inform those consumer reporting agencies that the BARCLAYS ACCOUNT never belonged to the Plaintiff and was opened and/or used as a result of identity theft.

### [D]
### COST AND FEES

7. In addition to any other monetary damages awarded to the Plaintiff, the Plaintiff respectfully request that the defendants be ordered to pay the costs of suit, including filing fees, service fees, witness and deposition fees, and to the extent authorized by rule or statute, costs of employing expert witnesses, and/or reasonable attorneys fees in the event that the Plaintiff either retains counsel to represent him in this matter.

### [E]
### MISCELLANEOUS AND OTHERWISE UNSPECIFIED RELIEF

8. The Plaintiff further demands any and all other relief which he may entitled to as a matter of law under, inter alia, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Rhode Island Fair Debt Collection Practices Act, Rhode Island's identity theft prevention and/or privacy statutes, and/or under R.I.G.L. § 9-1-2, allowing for civil liability for crimes and offenses; as well as pre and post judgment interest as permitted by law.

DATED: _____/_____/_____.

-135-

Respectfully Submitted:

Michael P. Tatro, Pro-Se.
Federal Reg. No.: 05951-070
33 1/2 Pembroke Road
Danbury, CT 06811-3099

### DEMAND FOR JURY TRIAL

The Plaintiff respectfully demands a jury trial on all issues so trialable.

-136-